172 P.3d 983

Clara Apiki OMEROD, Marvalene K. Apiki Adams, Basil Apiki, Jr., Rowena Kaulia, Mary L.K. Paris, and Bernadette Shipley, Plaintiffs–Appellants

v.

HEIRS OF Kainoa Kupuna KAHEANA-NUI, Defendants/Third–Party Plaintiffs/Cross–Claimants/Counter–Claimants/Cross–Appellants

and

Samuel K. Kaluna, Jr., Richard Hale Kaluna, Gary Poha Kaluna, Harriet A. Mamone, Esther K. Beck, Yvonne Ke, Leinaala Silva, Raymond Silva, Robert Silva, Thomas Silva, Jr., Marie Ah Yee, James Yoshida, Gary Napoleon, Ronald Kahee, Jr., Sarah Ann Kahee, and Shelly Ann Napoleon, Defendants/Cross–Appellants

and

Delano R. Keohokapu, Judith Kaui Koffman, Lily K. Farm, Joseph K. Keohokapu, Jr., Adeline Keohokapu Mandac, Doreen Makuakane, Barbara Cox, Audrey K. Yara, Peter Keohokapu, Arlene Wanda Iwalani McArthur and Benedict Aliiloaokaaina Solomon, Defendants–Appellants,

and

C. Brewer and Company, Ltd.; Mauna Kea Agribusiness, Co., Inc.; Ka'u Agribusiness Co., Inc.; and The Nature Conservancy, a District of Columbia Non–Profit Corporation, Defendants–Appellees

and

State of Hawai'i; State of Hawaii Office of Hawaiian Affairs; Clarence A. Medeiros, Jr., The Unknown Heirs and Assigns of the following: Kahuku, Puhi, 'Apiki, Kea; Kalakolohe, Ikiiki, Kapewa; Manuhaaipo, Moanalua, Kahooioi, Helehewa, Keamo, Kamana, and Mahuka; Doe Persons 1–10; Doe Partnerships 1–10; Doe Corporations 1–10; Roe "Non Profit" Corporations 1–10 and Roe Governmental Entities 1–10; Thomas Okuna; Ka'u Sugar, Inc.; Unknown Heirs and

Assigns of the following: E. Moa Puhi, Emma Pahoa, Nahuina, Joe, Christina Kapulani, Koluwahine, Keohokapu, Kauwa, Keoho, Kaoiwiaka, Kenui, Kamauu, Kalala, Kawelu, Ahia, Kaleo, Kekua, Kaha Nuahema, Kuaiwa, Kahula, Awihi, Kaoo, Kekupu, Kailiki, Ana, Nakookoo, Kaai, Kaaihuila, Kaaikuila, Lanae, Oliver Apiki, Leialoha Apiki, Clement Apiki, also known as C.K. Apiki, also known as C.A. Kahoomanawanui, Kahiona Apiki, Basil K. Apiki, Kahiilani Apiki, Maggie Kahoomanwanui, Malakina Apiki, George Apiki, Stephen K. Apiki, One Kimo Apiki, Caroline Apiki, Anna Apiki, Pauline Moanalua, Sylvester Apiki, Paulina Apiki, Joseph Enaena, Clement Iaea, Clement Enaena, Margaret Ahakuelo, Agnes Kahiona Lapaela, Agnes Clark, Jennie Enaena Wright, Raphael John Kelii Ahakuelo, Mary Ludloff, C.J. (Margaret) Fette, Elaine Lindsey, Raphael Apiki, Clement Apiki, Benedict K. Apiki, Jeremiah Kanakanui, Jeremiah K. Kanakanui, Jr., James Kanakanui, Jeremiah Kaapana, James Kaapana, Kekelia Apiki, Cecelia Apiki, Kaaehawaii Apiki, Rufina Pawai Apiki, Ruby Apiki, Stephen Apiki, Jr., Caroline Apiki, William Apiki, Mary Apiki, Harold Benjamin H. Bright, Happy H. Hanoa, Kelly H. Hanoa, Jr., Kainoa Hanoa, Inenoa Hanoa, Harriet Sibonga, Richard Enaean, Elsie Asuncion, Christopher Kaleiwahea, Benjamin Kaleiwahea, Karen Nalani Panui Muliwai, Priscilla Kealoha Panui White, Darlene Wright Vincente, Albert Wright, Benjamin Wright, Anna Leimomi Ahakuelo Neves, Tanya Pinard, Violet Apiki Punahele, Laura Mahiai, Haroldine Puanani Bright Manuel, Elston Louis Hooper, Katherine Ah Nee, Joseph Enaena, Jr., Basil K. Ahakuelo, Doreen P. Ahakuelo, Louella I. Ahakuelo, Margaret Kahiilani Enaean, Joseph Kailii Enaena, Jr., Abraham Kaloa Enaena, Luvonne Ululani Enaena, Francine Hoku Enaena, Tanya Lynn Piilani Enaena, Tracy Kilauea Iki Enaean, Stacy Mohina Enaena, Robert K. Ah Nee, Jr., Edmund Ah Nee, Patricia Kamalu, Mele Kalua, Kalua Opio, Mariama Kahuakalane, Mariam Kauhane

Lane, Richard Carey Lane, Catherine Lane, Clarence K. Lane, Junius E.K. Lane, Rochelle M.K. Tokuhara, Lot C. Lane, Junius E. Lane, Lona K. Urbshot, Gerald Kanekawaiola Urbshot, June L. Tokuhara, Thomas Masao Tokuhara, Moana Gail Lane, Kara E. Lane, Richard Lane, Jr., Miriam K. Lane, Noah Noble Kauhane, Minnie Bolster Kauhane, Noble Hustace Kauhane, Phoebe Reuter, Phoebe Reuter Kauhane, Abraham Hubert Kauhane, Betty Ann Kauhane, Betty Ann Kramer, Kirkland Patrick Kauhane, Dwight Kramer Kauhane, Kyle D. Kauhane, Donna Ann Leinani Kauhane Aquino, David Brian Aquino, Stuart Kauhane, Eileen Lota, Nobleen Fannemel, Francis Kauhane, Ella Kauhane, Francis Kauhane, Jr., Brenda Kauhane, Dorothy Akana, Dorothy Henderson, Priscilla Ho, Katherine Ching, Arthur Ching, Jr., Leona Spencer, Katherine Chang, Richard Melvin Ching, Martha Ayau, Vida Puala Schell, Roblee James Ching, Eunice Noelani Davis, Keith Davis, Kathy Louise Lee, David Keohokapu, Martin Aupuni Keohokapu, Danielle Keohokapu Richard, Andrea Keohokapu, Rose Kauhane Kila, Beven Liilii Kila, Sr., Daisy Kaluaapana Kila Hulama, Edward Sonny Wise, Daisey Kaluaapana Wise, Edward Waiau, Elizabeth Miala Kaahanui, Edward Waiau Wise, George Mosees Hulama, Daisy K. Hulama, Melissa Ann Kamala Hulama, Beven Kila, Jr., Beven Liilii Kila, Jr., Jane Keamalu Kila, Eva Leilani Kila, Eva Leilani Leong, Herbert Akana Leong, Stephanie Naomi Leong, Michael Stephan Kaleiopu, Hubert Akana Leong, Jr., Sylvia Yuk Lan Mamo Tong Leong, Dennis Milton Leong, Karen Annabelle Lordahl Leong, Nadine Keoni Leong Kakalia, David Kupa Kakalia, Danny Akana Kakalia, Eva Leilani Leong Kakalia, David Kupa Kakalia, Jr., Edwina Kakalia, Jennie Leilani Kekalia, George Moses Hulama Leong, Miriam Manohealii Kila, Rose Ilima Kila, Rita Kulamika Kila, Rebecca Lucille K.K. Kila Kauo, Edward Opio Kauo, Noble Hulbert K. Kila, Roert P. Kila, Velmar O. Kalua, Robert P. Kila, Doreen Baptiste, Cheryl Tudor; and all to whom it may concern; also, Pursuant to the requirements of § 669-2(c)(1) HRS, the following are the owners, so far as known, of the kuleanas and other grants in those portions of the Ahupua‘a of Hilea where Plaintiffs claim common law property rights and/or Native Tenant Pash rights as identified herein: Heirs and assigns of Nawahine, Patentee of Land Commission Award (hereinafter "LCA") 10371:1; Heirs and assigns of Lonoahiho, Patentee of LCA 9714-B; Heirs and assigns of Kailiawa, Patentee of LCA 9286:1, 2; Heirs and assigns of PUA, Patentee of LCA 10685:1, 2; Heirs and assigns of Wa‘apā Patentee of LCA 10952:1; Heirs and assigns of Nailieha, Patentee of LCA 9212-C: 1, 2; Heirs and assigns of KUOAHA, Patentee OF LCA 9172: 1, 2; Heirs and assigns of Kaiiwi, Patentee of LCA 8592; Heirs and assigns of Kahoponui, Patentee of LCA 9086; Heirs and assigns of Pueo and Heirs and assigns of Kainoa Kupuna, Patentees of LCA 10654: 1, 2; Heirs and assigns of Kaia, Patentee of LCA 9125; Heirs and assigns of Keka‘a, Patentee of LCA 9091, Heirs and assigns of MOA, Patentee of LCA 7733: 2, 3: Heirs and assigns of AKA, Patentee of LCA 11070; Unknown owner, TMK 9-5-18-15, 10.932 acres; Heirs and assigns of Uluhani, Patentee to LCA 10914:1; Heirs and assigns of Maluae, Patentee of LCA 10190:2; Heirs and assigns of Kanehailua, Patentee of LCA 9195; Unknown heirs and assigns of unknown patentee of LCA 10088; Heirs and assigns of Mahuka, Patentee of LCA 10073; Heirs and assigns of Makapahawa, Patentee of LCA 10094; Heirs and assigns of Kalakolohe, Patentee of LCA 8760-C; Heirs and assigns of Helehewa, Patentee of LCA 9212-B; and Anna E. Searle; C. Brewer and Co., LTD, as owners of TMK 9-5-16-35, which includes portions of Grants 2481, 2943, 2645, 2647, 2651, 2645; and as owners of TMK 9-5-15-3; and TMK 9-5-20, 22, including portions

of Grants 13500, S–13775 and 2153; Thomas M. Okuna, as owner of Grant 2648; portion of LCA 9971:11; and Grant 993; State Of Hawai'i, as owner of TMK 9–5–19–1, 2, 28 and TMK 9–5–18–19, Defendants.

No. 27118.

Supreme Court of Hawai'i.

Nov. 15, 2007.

Stanley S. Roehrig and Andrew P. Wilson (Roehrig, Roehrig & Wilson), Hilo; Robert G. Klein (McCorriston Miller Mukai Mac-Kinnon), Honolulu; and Peter V.N. Esser, Honolulu, on the briefs, for plaintiffs-appellants.

Dwayne Stephen Lerma and Jo Anne E. Goya (Lerma & Goya), Hilo; and Alfred P. Lerma, Jr., Kealakekua, on the briefs, for Kaheananui Appellants.

Sherry P. Broder, Honolulu, on the briefs, for Kaluna Appellants.

Gary G. Grimmer (Carlsmith Ball), Honolulu, on the briefs, for Defendants–Appellees C. Brewer & Co. and co-counsel for The Edmund C. Olson Trust 2.

Paul Alston and Lea Hong (Alston Hunt Floyd & Ing), Honolulu, on the briefs, co-counsel for The Edmund C. Olson Trust 2.

Robert Bruce Graham, Jr. and Michael W. Gibson (Ashford & Wriston), Honolulu, on the briefs, for Defendant–Appellee The Nature Conservancy.

Sheryl L. Nicholson and Colin A. Yost (Paul Johnson Park & Niles), Honolulu, on the briefs, for Defendant State of Hawai'i Office of Hawaiian Affairs.

MOON, C.J., NAKAYAMA, ACOBA, JJ., and Circuit Judge MARKS in Place of DUFFY, J., Recused; with LEVINSON, J., Concurring in the Result Only.

Opinion of the Court by ACOBA, J.

This appeal arises from a quiet title action filed in the circuit court of the third circuit[1] (the court) involving numerous parties and several dispositions. To summarize, Appellants[2] claim an undivided one-half interest in

---

1. The Honorable Greg K. Nakamura presided.

2. The various Appellants in this action are: (1) Plaintiffs/Appellants/Cross–Appellees Clara Apiki Omerod, Marvalene K. Apiki Adams, Basil Apiki, Jr., Rowena Kaulia, Mary L.K. Paris, and Berna-

dette Shipley [collectively, Omerod Appellants or Omerod]; (2) Defendants/Cross–Appellants Samuel Keolamauloa Kaluna, Jr., Richard Hale Kaluna, Gary Poha Kaluna, Harriet A. Mamone, Esther K. Beck, Yvonne Ke, Leinaala Silva, Raymond

the ahupuaʻa[3] of Hilea Nui under the theory that Prince Lot Kamehameha (Lot) and Chief Leleiohoku (Leleiohoku) were granted a cotenancy in a single ahupuaʻa known as "Hilea" at the time of the Great Mahele,[4] as opposed to receiving grants in fee simple of two separate ahupuaʻas, Hilea Iki and Hilea Nui. They contend that Hilea Iki and Hilea Nui actually represent ʻilis, or administrative divisions, of the single ahupuaʻa of Hilea. Appellants further maintain that the cotenancy created between Lot and Leleiohoku continues to the present, between Appellants

(Lot's successors in interest) and Appellees (Leleiohoku's successors in interest).

On the other hand, the essence of Appellees'[5] argument is that the Boundary Commission of the Kingdom of Hawaiʻi determined the relative boundaries of Hilea Iki and Hilea Nui in 1877, defining them as two adjacent ahupuaʻas owned in fee simple, and that the Boundary Commission's judgment cannot be collaterally attacked by Appellants.

For the reasons stated herein, we affirm the (1) November 30, 2004 Hawaiʻi Rules of Civil Procedure (HRCP) Rule 54(b)[6] Partial Final Judgment (Rule 54(b) Judgment)[7], (2)

---

Silva, Robert Silva, Thomas Silva, Jr., May Ah Yee, James Yoshida, Gary Napoleon, Ronald Kahee, Jr., Sarah Ann Kahee and Shelly Ann Napoleon, [collectively, Kaluna Appellants or Kaluna]; (3) Defendants/Third–Party Plaintiffs/Cross–Claimants/Counter–Claimants/Cross–Appellants Heirs of Kainoa Kupuna [hereinafter, Kaheananui Appellants or Kaheananui Heirs]; (4) Defendants/Appellants Delano R. Keohokapu, Judith Kaui Koffman, Lily K. Farm, Joseph K. Keohokapu, Jr., Adeline Keohokapu Mandac, Doreen Makuakane, Barbara Cox, Audrey K. Yara, Peter Keohokapu, Arlene Wanda Iwalani McArthur, and Benedict Aliiloaokaaina Solomon [collectively, Keohokapu Appellants or Keohokapu].

3. Ahupuaʻas were large land divisions that typically ran from the mountains to the sea. Mary Kawena Pukui & Samuel H. Elbert, *Hawaiian Dictionary* 9 (rev. ed.1986).

4. Mahele is defined generally as a portion or division. *Id.* at 219. The Great Mahele is the name given to the land division of 1848, *id.*, discussed *infra* at II.A.

5. The Appellees are Defendants–Appellees C. Brewer & Company (C. Brewer), its subsidiaries, Mauna Kea Agribusiness, Co. (MKA) and Kaʻu Agribusiness Co., Inc. (Kaʻu Agribusiness), The Nature Conservancy (TNC), and the Olson Trust (Olson). TNC and Olson purchased portions of C. Brewer's interest in Hilea Nui during the course of this litigation. On January 13, 2005, counsel for C. Brewer and Olson filed a Stipulation Between Defendants and Transferee for Entry of Order for Substitution of Transferee and Appearance of co-counsel for Transferee, reporting that Defendants MKA and Kaʻu Agribusiness had been merged into C. Brewer and that C. Brewer had conveyed the land at issue to Edmund C. Olson, as Trustee of the Olson Trust. The parties stipulated that Olson would be substituted as Defendant for C. Brewer, MKA, and Kaʻu Agribusiness. However, it does not appear from the record that this substitution was ordered.

6. HRCP Rule 54(b) (2004), *Judgment upon multiple claims or involving multiple parties*, provides:
 > When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.
 (Emphasis added).

7. The Rule 54(b) Judgment certified for appeal several interlocutory orders, including the (1) January 16, 2004 Order on Defendants MKA's and Kau Agribusiness Co.'s (Kau Agribusiness) Motion for Protective Order (Protective Order); (2) March 22, 2004 Decision and Order regarding (a) Defendant MKA's Motion for Summary Judgment, (b) TNC's Joinder in Defendant MKA's Motion for Summary Judgment, (c) Defendant MKA's Motion for Summary Judgment Against Kaluna Appellants, (d) Omerod Appellants' Motion for Summary Judgment Against Defendants MKA and TNC, and (e) Kaluna Appellants' Joinder in Omerod Appellants' Motion for Summary Judgment (Decision and Order); and (3) July 16, 2004 Order Denying in Part and Granting in Part (a) Omerod Appellants' Motion for Reconsideration, Or, in the Alternative, for Rule HRCP 54(b) Certification of Partial Final Judgment, (b) Kaluna Appellants' Motion for Reconsideration Or, in the Alternative, for an Order of Interlocutory Appeal Or, in the Alternative, for Rule HRCP 54(b) Certification of Partial Final Judgment, (c) Kaheananui Appellants' Joinder in Omerod Appellants' Motion for Reconsideration (Reconsideration Order).

February 4, 2005 Order Denying (a) Omerod Appellants' Motion to Alter or Amend Judgment Pursuant to HRCP Rules 59(e) (2007) [8] and 60(b)(2) (2007) [9] and (b) Kaheananui Appellants' [10] Motion to Alter or Amend Judgment Pursuant to HRCP Rules 59(e) and 60(b)(2), All Supplements Thereto and All Joinders Thereto (February 4, 2005 Order); (3) July 7, 2005 Order Denying Defendant C. Brewer's Motion to Quash Subpoena Issued to John Cross (July 7, 2005 Order); and (4) July 8, 2005 Order Denying Plaintiffs' Motion for Relief from Judgment Pursuant to HRCP Rule 60(b) (2007) [11] and For Sanctions (July 8, 2005 Order).

## I.

Omerod Appellants appeal from the (1) Rule 54(b) Judgment; (2) February 4, 2005 Order; (3) July 7, 2005 Order; and (4) July 8, 2005 Order. They request this court "to reverse the rulings, judgments and order[s] of [the court] and to issue a mandate to [the court] to enter judgment for Appellants ..., including an award of fees and costs."

The Kaheananui Appellants appeal and cross-appeal from the (1) Rule 54(b) Judgment; (2) February 4, 2005 Order; (3) July 7, 2005 Order, and (4) July 8, 2005 Order. They request simply that this court "reverse [the court's] decision."

The Kaluna Appellants appeal and cross-appeal from the (1) Rule 54(b) Judgment and (2) February 4, 2005 Order.

---

**8.** HRCP Rule 59(e), *Motion to alter or amend judgment*, provides that "[a]ny motion to alter or amend a judgment shall be filed no later than 10 days after entry of judgment."

**9.** HRCP Rule 60(b)(2) vests the court with authority to "relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under [HRCP] Rule 59(b)(3)[.]"

**10.** The Heirs of Kainoa Kupuna Kaheananui have been designated variously as "Heirs of Kainoa Kupuna", "Heirs of Kainoa Kupuna Piipali", and "Heirs of Kainoa Kupuna Kaheananui" throughout this litigation. For purposes of clari-

Keohokapu Appellants appeal from the (1) Rule 54(b) Judgment and (2) February 4, 2005 Order.

## II.

### A.

This court has recognized that the traditional Hawaiian concept of land ownership was markedly different from Western notions of ownership embodied in the common law. *Pub. Access Shoreline Haw. v. Hawai'i County Planning Comm'n*, 79 Hawai'i 425, 442, 903 P.2d 1246, 1263 (1995) [hereinafter, *PASH* ]; *In re Boundaries of Pulehunui*, 4 Haw. 239, 240–41 (1879) (stating that, "from prehistoric times, every portion of the land constituting these Islands was included in some division, larger or smaller, which had a name, and of which the boundaries were known to the people living thereon or in the neighborhood").

Under the Constitution of 1840, although all the land "belonged" to the King, it was not his personal property. *PASH*, 79 Hawai'i at 443, 903 P.2d at 1264 (quoting *Reppun v. Bd. of Water Supply*, 65 Haw. 531, 542, 656 P.2d 57, 65 (1982)). Rather, it belonged to the chiefs and the people, and the King, as the head of the chiefs and the people, managed the land. *Id.* "Thus, prior to the Mahele, all the land remained in the public domain." *Id.*

As noted previously, under the traditional land tenure, the islands were apportioned into large tracts called ahupua'as. Large

---

ty and consistency, they will be referred to as the "Kaheananui Appellants" or "Kaheananui Heirs" in this opinion.

**11.** The portions of HRCP Rule 60(b) relevant to this particular motion provide:

(b) *Mistakes; inadvertence; excusable neglect; newly discovered evidence; fraud, etc.* On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (2) *newly discovered evidence* which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) *fraud* (whether heretofore denominated intrinsic or extrinsic), *misrepresentation, or other misconduct* of an adverse party[.]

(Emphases added.)

ahupua'as generally contained subdivisions called 'ilis. *Territory v. Tr. Est. Kanoa, Dec. et al.,* 41 Haw. 358, 361 (1956). The 'ilis were managed by konohikis, the King's chiefs, who brought the 'ili's revenues to the chief who owned the ahupua'a. *Harris v. Carter,* 6 Haw. 195, 206 (1877).

In 1845, the Board of Commissioners to Quiet Land Titles (Land Commission) was established to facilitate the transition from the traditional landholding scheme to a more western system, while preserving the traditional concept of joint ownership. Its initial purpose was "to investigate and settle all land claims of private individuals, whether native or foreign." *Makila Land Co., LLC v. Kapu,* 114 Hawai'i 56, 58, 156 P.3d 482, 484 (App.2006) (citing Melody Kapilialoha Mac-Kenzie ed., *Native Hawaiian Rights Handbook* 151 (1991)). "It was the Land Commission's responsibility to ascertain or reject claims of interests in land brought before it." *PASH,* 79 Hawai'i at 445, 903 P.2d at 1266. The Principles of the Land Commission required the commissioners to

"first elicit from creditable witnesses, the fact or history of each [claim]; and thus assort or reconcile those facts to the provisions of the civil code, whenever there is a principle in past legislation applicable to the point under consideration; but when no such principle exists, they may judicially declare one, in accordance with ancient usage and not at conflict with any existing law, nor at variance with the facts, and altogether equitable and liberal."

*Kapiolani Estate v. Atcherley,* 21 Haw. 441, 459 (1913) (Perry, J., concurring and dissenting) (quoting Principles of the Land Commission, R.L., p. 1175). "The awards of the [Land C]ommission were to be deemed final and binding upon all parties unless appealed." *McBryde Sugar Co., Ltd. v. Robinson,* 54 Haw. 174, 185, 504 P.2d 1330, 1338 (1973).

■ After the Land Commission entered a Land Court Award (LCA), the Minister of Interior could issue a Royal Patent after the awardee paid a commutation fee. *State v. Zimring,* 58 Haw. 106, 111, 566 P.2d 725, 730 (1977). In essence, a Royal Patent was a quitclaim of the government's interest in the pertinent land. *Mist v. Kawelo,* 11 Haw.

587, 589 (1898). The applicable statute provided:

A Royal Patent, signed by the King, and countersigned by the Minister of the Interior, shall issue under the great seal of the kingdom to the purchaser in fee simple of any Government land or other real estate; and also to any holder of an award from the [Land Commission] for any land in which he may have commuted the Government rights.

*Pratt v. Holloway,* 17 Haw. 539, 541 (1906) (internal quotation marks and citation omitted). In order to obtain a Royal Patent, and therefore to obtain fee simple ownership of land conveyed during the Mahele, an awardee needed to present a Boundary Commission judgment describing his or her land by metes and bounds. *In re Boundaries of Paunau,* 24 Haw. 546, 556 (1918) (noting that the purpose of the Boundary Commission and its "right to certify boundaries was to enable owners of land which had been awarded ... by name only to obtain [R]oyal [P]atents defining their lands by metes and bounds [ ]" (citation omitted)).

"In 1847, the King together with the Privy Council determined that a land mahele, or division, was necessary for the prosperity of the Kingdom." *Zimring,* 58 Haw. at 112, 566 P.2d at 730. According to this plan, "the King [would] retain all his private lands as individual property and ... that of the remaining lands, one-third was to be set aside for the Government, one-third to the chiefs and konohiki and one-third for the tenants." *Id.* (footnotes omitted). The Great Mahele started in 1848. *Id.* "The Mahele agreements were essentially reciprocal quitclaims and did not convey title. Detailed claims had to be presented to the Land Commission for formal [LCAs]." *Id.*

Similarly, the Land Commission itself could not convey fee simple title to land. *PASH,* 79 Hawai'i at 445, 903 P.2d at 1266 (citing J. Chinen, *The Great Mahele: Hawaii's Land Division of 1848* (1958)). "Rather, its duty was to define each applicant's identifiable interests in land and issue an award describing those interests. Actual title to land could be gained only by a payment

of commutation to the Kingdom and issuance of a royal patent." *Id.*

■ Thus, "[t]o establish legally cognizable private title to land ... one must show that he or a predecessor-in-interest acquired a [LCA], a Royal Patent, a Kamehameha Deed, a Grant, a Royal Patent Grant, or other government grant for the land in question." *Zimring,* 58 Haw. at 114, 566 P.2d at 731 (citing *Thurston v. Bishop,* 7 Haw. 421 (1888); *In re Title of Pa Pelekane,* 21 Haw. 175 (1912)); *see also Rose v. Yoshimura,* 11 Haw. 30, 32 (1897) (stating that "neither the Mahele ... nor an application for an award gave any title, and ... until an award was made by the [Land Commission] or by the Minister of the Interior (after 1860), the land must be considered to still belong to the government[ ]" (internal citations omitted)).

Because of the enormous amount of land involved, "[t]he Mahele ... was ... made without survey. Tracts of land ... were awarded to those entitled by name of the ahupuaa or ili. By such grant was intended to be assigned whatever was included in such tract according to its boundaries as known and used from ancient times." *Pulehunui,* 4 Haw. at 240 (internal quotation marks omitted).

■ When Mahele awards were presented to the Land Commission, many LCAs were made without survey, that is, by name only. *Paunau,* 24 Haw. at 554. Thus, the Boundary Commission was created "to enable those who had been awarded lands by name only to afterward procure an authentic description of their land...." *Id.* Both LCAs and Boundary Commission judgments *"were judicial determinations,* and were the only legal mode of confirming and fixing boundaries, and, when pursued were *binding upon the whole world." Territory v. Liliuokalani,* 14 Haw. 88, 105 (1902) (Thomas Fitch, Esq., concurring) (emphases added).

### B.

The following facts are taken from the parties' briefs and the record and the chronology is undisputed. The significance or correct interpretation of the events may be disputed, as set forth extensively *infra.*

On January 27, 1848, as part of the Mahele, land identified as "Hilea" was granted to Lot. Page 13 of the Mahele Book shows: "To [Lot] ... Ahupuaa ... Hilea." On January 28, 1848, also during the Mahele, land identified as "Hilea" was granted to Leleiohoku. This allotment is recorded on page 29 of the Mahele Book as follows: "To [Leleiohoku] ... Ahupuaa ... Hilea." In 1855, LCA 7715, Apana 14 (alternatively designated as LCA 7715:14) was awarded to Lot. Also in 1855, LCA 9971, Apana 11 (alternatively designated as LCA 9971:11) was awarded to Leleiohoku. Throughout the 1850s, Kekuanao'a, Lot's father and Leleiohoku's father-in-law, collected rents on both Hilea parcels. According to Omerod Appellants, Kekuanao'a's records do not designate Hilea Iki and Hilea Nui as separate ahupua'as.

On May 5, 1857, Lot executed a deed that conveyed "absolutely unto Kahaku, Puhi, Apiki, Kea, Moanalua, Kalakolohe, Ikiiki, Kapewa, Manuhaaipo, Kahooioi, Helehewa, Keamo, Kamana and Mahuka residing at Hilea, Kau, on the Island of Hawaii, and their heirs, executors, administrators or assigns forever [his] entire right in and to the Ahupuaa of Hilea." The deed identified Hilea as the land awarded to Lot pursuant to LCA 7715:14. In 1864, Nicholas George leased Hilea Nui and Hilea Iki. In sworn testimony before the Boundary Commission, Nicholas George stated: "I leased the land of Hilea[ N]ui from shore to Kauhine for eight years. I leased Hilea[ I]ki for three years from fourteen persons who owned the land."

On October 16, 1873, the Boundary Commission considered a petition for the "settlement of boundaries for the Ahupua'a of Hilea[ I]ki District of Ka'u Island of Hawai'i 3rd J.C." The petitioners stated in their petition that they were "the owners of the land or ahupuaa of Hilea[ I]ki .... That the said land or ahupuaa was awarded to [Lot] by [LCA 7715:14] and conveyed to the undersigned by [Lot] by deed dated May 8, [sic] 1857 ...." The petition identified the neighboring lands, including "Hilea[ N]ui or Hilea 1st," which petitioners averred belonged to Princess Ruth Keelikolani (Ruth), Leleiohoku's widow and ultimate heir.

On October 18, 1873, the Boundary Commission considered Ruth's petition for the settlement of the boundaries of "Hilea[ N]ui."

On October 9, 1877, the Boundary Commission entered a judgment on the petition to set the boundaries of Hilea Nui. The judgment described Hilea Nui by metes and bounds, commencing "at a rock in the sea, on the [s]outh[w]est side of Kawaa Bay, which rock is the boundary of Hilea and Kaalaiki...."

Also on October 9, 1877, the Boundary Commission entered a judgment on the petition to set the boundaries of Hilea Iki. The Boundary Commission's judgment described Hilea Iki by metes and bounds, "[b]eginning at the seashore, adjoining Hilea [N]ui at a place called 'Puuainako,' and running inland, adjoining Hilea [N]ui as follows...." C.K. 'Apiki, an ancestor of the Omerod Appellants, apparently appealed this decision. However, his appeal was not perfected and was ultimately abandoned.

On November 19, 1877, a lease of the "ahupua'a of Hilea [N]ui" from Ruth to C.N. Spencer was recorded.

According to Omerod Appellants, for twenty years before the Boundary Commission judgment, only one ahupua'a of Hilea was noted in tax records. From 1878, however, they note that taxes were assessed against two ahupua'as—Hilea Iki and Hilea Nui.

In 1882, Ruth conveyed to Samuel Parker land designated as Hilea. The deed originally identified the land as "the Ahupua'a of Hilea, [LCA] No. 7715 to [Lot]." The deed was altered at some unknown time. "7715 to [Lot]" was stricken and "9971" was inscribed as the pertinent LCA number. In 1883, Parker conveyed to William Irwin a one-half undivided interest in various properties, including the "Ahupua'a of Hilea, [LCA] No. 7715 to [Lot]" and the "Ahupua'a of Hilea, [LCA] No. 9971 to [Leleiohoku]." Several months later, Parker and Irwin conveyed their interests in the "'Ahupua'a of Hilea' [LCA] No. 9971 to Leleiohoku, said Ahupua'a having been conveyed to [Parker] by deed of [Ruth] dated September 9th A.D. 1882...."

In September 1882, Royal Patent 7621 was issued. It pertained to LCA 7715:14, which

the Land Commission had "by their decision awarded. unto [Lot.]". The Royal Patent "granted in fee simple unto [Lot] that entire place at Hilea [I]ki, Kau, on the island of Hawaii, and bounded as follows: [c]ommencing at the stream adjoining with Hilea Nui ... and running inland to join with Hilea Nui[,]" and further described Hilea Iki by metes and bounds. The parties' briefs do not indicate whether a Royal Patent was ever issued for Hilea Nui.

### C.

The following description of the course of the previous quiet title litigation regarding Hilea is taken from Omerod Appellants' Opening Brief:

[A] C. Brewer subsidiary filed Civil 9073 on August 12, 1983, in the Third Circuit Court to quiet title to a portion of Hilea [I]ki. Based on the belief that they only had an interest in an ahupua'a called Hilea [I]ki, as reflected on the tax map utilized in Civil 9073, *the 'Apiki family, including lead Appellant herein, Clara 'Apiki Omerod, entered into a Stipulated Decree filed June 8, 1994, in Civil 9073 to ownership of a portion of a 100–acre parcel only in Hilea [I]ki in exchange for a disclaimer to C. Brewer of further ownership in the ahupua'a of Hilea [I]ki ....*
An in-court November 14, 1986, stipulation by counsel referred to this 100–acre parcel within LCA 7715 to [Lot] as follows:

> "[T]he above mentioned defendants will get a [sic] 100 undivided acres within that portion of [LCA] 7715:14 involved in this dispute ... [and] the Apikis will hereby disclaim any and all further interest in 7715[:]14 above the Old Government Road that is not involved in this ... lawsuit."

(Emphasis added.) According to them, the land entailed in the Stipulated Decree was more fully described when the agreement was reduced to writing as "the remainder of Royal Patent 7621, [LCA] 7715, Apana 14." As noted above, Royal Patent 7621 granted in fee simple to Lot all of Hilea Iki, which he had been awarded in the Mahele, as confirmed by LCA 7715:14. *See supra* at 249, 172 P.3d at 993.

**D.**

On August 18, 2003, Omerod filed a Complaint to Quiet Title, for Partition, and for Award of Common Law Property Rights and Native Tenant PASH Rights. Omerod amended the Complaint on August 27, 2003 (Amended Complaint). In the Amended Complaint, Omerod claimed that title to the entire ahupua'a of Hilea was held in cotenancy by Omerod Appellants, as successors in interest to Lot, and C. Brewer, as successor in interest to Leleiohoku.

On October 23, 2003, Defendant MKA filed its Motion for Summary Judgment, arguing that Omerod's claim was barred by the (1) Boundary Commission's Certifications, (2) Judgment in *Okuna v. Apiki*, Civ. No. 9073 (3d Cir.Hawai'i), and (3) disclaimer in *Okuna*. Omerod filed her Memorandum in Opposition on January 8, 2004.

On December 29, 2003, Omerod filed her own Motion for Summary Judgment against MKA and TNC, arguing that: (1) Omerod owned that portion of Hilea known as Hilea Nui as an equal cotenant of MKA and TNC, (2) MKA and TNC did not "have fee simple absolute paper title" to Hilea Nui, and (3) neither MKA, TNC, nor their predecessors in interest had gained fee simple title to Hilea Nui through adverse possession or intentional relinquishment. On the same day, Kaluna Appellants filed their Motion for Summary Judgment and joined in Omerod's Motion for Summary Judgment.

MKA and TNC filed their January 7, 2004 Memorandum in Opposition to Omerod's Motion for Summary Judgment, countering that (1) Omerod failed "to raise a genuine issue of material fact that [LCA] 7715:14 and [LCA] 9971:11 were for undivided interests in one

piece of land", (2) Omerod failed "to raise a genuine issue of material fact as to [her] *Okuna* litigation disclaimer to any and all interest in [LCA] 7715:14", (3) Omerod had "no standing to challenge [MKA's] title to [LCA] 9971:11", and (4) Omerod had "no standing to raise the issue of dismissing . . . [MKA's a]dverse [p]osession [c]laim."

**III.**

**A.**

The court heard all of the motions for summary judgment on January 16, 2004, and entered its Decision and Order on March 22, 2004.[12]

The court's grant of summary judgment in favor of Defendants–Appellees MKA and TNC was based on the following "undisputed facts":

■ On January 27, 1848, pursuant to the Mahele, land identified as "Hilea" was allotted to [Lot].

■ On January 28, 1848, also pursuant to the Mahele, land also identified as "Hilea" was allotted to [Leleiohoku].

■ *In 1855, pursuant to [LCA] 7715, Apana 14; LCA 7715, Apana 14 was awarded to [Lot].* The award reflected the interest acquired by [Lot] in "Hilea" under the Mahele.

■ *In 1855, pursuant to LCA 9971, Apana 11; LCA 9971, Apana 11 was awarded to Leleiohoku under the Mahele.*

■ The award reflected the interest acquired by Leleiohoku in "Hilea" under the Mahele.

■ *Pursuant to a deed dated and recorded on May 5, 1857, [Lot] granted to*

---

12. The Decision and Order ruled on (1) MKA's motion for summary judgment against Omerod, (2) TNC's joinder in MKA's motion for summary judgment against Omerod, (3) MKA's motion for summary judgment against Kaluna, (4) Omerod's motion for summary judgment against MKA and TNC, and (5) Kaluna's joinder in Omerod's motion for summary judgment against MKA and TNC. Although the court did not rule on the Heirs of Kaheananui's motion for summary judgment and joinder, their claims were resolved in the Rule 54(b) Judgment. The court ruled that their claim

in and to Hilea Nui mauka [toward the mountains] of the Old Government Road, under a claimed interest in [LCA] 7715:14, has been dismissed by the [c]ourt pursuant to the following: . . . *Heirs of [Kaheananui] stipulated with [Omerod] and Defendants [C. Brewer] and [TNC] by stipulation filed November 26, 2004, that . . . [Heirs of Kaheananui] are bound by the law of the case contained in the March 22, 2004 Decision and Order, except the references to the prior Okuna action, and that their claims in Hilea Nui mauka of the Old Government Road, under [LCA] 7715:14 are dismissed* . . . .
(Emphasis added.)

Kahaku, Puhi, Apiki, Kea, Moanalua, Kalakolohe, Ikiiki, Kapewa, Manuhaaipo, Ka-·hooioi, Helehewa, Keamo, Kamana and Mahuka *all of his interest in the "Ahupuaa of Hilea" awarded pursuant to LCA 7715, Parcel 14.*

◼ On October 16, 1873, the Boundary Commission considered a petition for the "settlement of boundaries for the Ahupuaa of Hilea[ I]ki[,] District of Kau[,]Island of Hawai'i[,] 3rd J.C[.]" *In the petition, the petitioners stated as follows:*

The undersigned would respectfully represent to you, that we are the owners of the land or ahupuaa of Hilea [I]ki situated in the District of Kau, Island of Hawaii. *That the said land or ahupuaa of Hileaiki was awarded to [Lot] by [LCA 7715:14] and conveyed to the undersigned by [Lot] by deed dated May 8th, [sic] 1857,* and recorded at the Registrar's office in Liber 9[ ] pages 215[ ] and 216[ ] and that the boundaries of said land have not as yet been described or defined by [LCA], Royal Patent, or by deed from The King. That the said land is within the jurisdiction of the Honorable Commission of Boundaries for the Third Judicial Circuit. *That the lands adjoining the said land of Hilea [I]ki,* and the owners of the same as far as known to your petitioner are as follows

| Name of Lands | Owners |
| --- | --- |
| *Hilea Nui or Hilea 1st* | *R. Keelikolani* |
| Ninole | D. Holoua |
| | Hawaiian Government |
| Kahuku | G.W.C. Jones and C.E. Richardson |

Wherefore your petitioners pray that a day and place may be appointed for the taking of testimony in reference to the boundaries of said land; and *that the owners of the adjoining lands be notified to appear, and show cause if any, why a Certificate of Boundaries should not be issued to the undersigned according to law.*

And as in duly bound your petitioners will even pray [illegible]

(Signed) .Kaohokapu.Kahaku
.C.K. Apiki Puhi
.Kapewa.Konokaha
.C. Kamauu
.Manuhauipo
.Kahalekai
.Kahoioi

◼ On October 18, 1873, the Boundary Commission considered the petition for the settlement of the boundaries of the [sic] "Hilea [N]ui, Kau" presented by [Ruth].

◼ *On October 9, 1877, the Boundary Commission entered a Judgment determining the boundaries of "Hilea [I]ki, District of Kau, Island of Hawaii".*

◼ *Also, on October 9, 1877, the Boundary Commission entered a Judgment determining the boundaries of "Hilea [N]ui[,] District of Kau, Island of Hawai'i."*

◼ In September[ ] 1882, Royal Patent No. 7621 was issued. It provided as follows:

Whereas, the [Land Commission has] by [its] decision awarded unto [Lot], [LCA 7715:14] in the nature of a major interest [*Kuleana Nui*], less than allodial, in the below premises, and whereas [illegible name] has petitioned that a Royal Patent on this *Ahupuaa* be issued by the Minister of the Interior, whereas the Government has released his commutation within this *Ahupuaa* under a certain decision by the Cabinet of King Kamehameha III,

Therefore, by his Royal Patent, Kalakaua, by the grace of God King of the Hawaiian Islands makes known to all men that he has on this day for himself and his successors in office *granted in fee simple unto*

*Lot Kamehameha*

*that entire place at Hilea[ I]ki, Kau,* on the island of Hawaii, and bounded as follows:

Commencing at the stream *adjoining with Hilea Nui,* at a place called Puuainako, *and running inland to join with Hilea Nui* as follows:

. . .

◼ *[Omerod Appellants] claim an interest in Hilea Nui under LCA 7715, Apana 14, pursuant to the May 5, 1857 deed.*

◼ *[Kaluna Appellants] claim an interest in Hilea Nui under LCA 7715, Apana 14* pursuant to the May 5, 1857 deed as heirs or descendants of Kapewa or Puhi.

(Emphases added.) (Citations and footnote omitted.) (Some brackets in original and some added.)

The court identified the following facts as "salient" to its determination that summary judgment was warranted based on collateral estoppel.

1. [Lot] was given "Hilea" under the Mahele.

2. In order to have his interest in "Hilea" recognized, [Lot] applied for and was awarded LCA 7715, Apana 14.

3. [Lot] conveyed his interest under LCA 7715, Apana 14 to Apiki, Kapewa, Puhi and others.

4. As required by law in order to obtain fee simple title, Apiki, Kapewa, Puhi and others petitioned the Boundary Commission for a determination of the boundaries of LCA 7715, Apana 14.

5. *In the petition, the petitioners assumed that the boundaries of LCA 7715, Apana 14 were the same as the boundaries of Hilea Iki.*

6. *A judgment was entered by the Boundary Commission delineating the boundaries of Hilea Iki and therefore LCA 7715, Apana 14.*

7. *None of the petitioners appealed the Boundary Commission judgment.*

8. *Pursuant to Royal Patent No. 7621, [Lot] (and more particularly his successors in interest) received fee simple title to LCA 7715, Apana 14 which was land described as Hilea Iki.*

(Emphases added.)

### B.

Although not designated as such in the Decision and Order, the court made the following apparent conclusions of law.

First, that MKA did not "have the burden of proving title to an interest under LCA 9971, Apana 11 nor in Hilea Nui[,]" because MKA did not "seek[ ] a judgment quieting title to Hilea Nui or Hilea Iki in its favor" but rather, it ·sought "summary judgment dismissing [Omerod's] claims of title to 'the Ahupua'as of Hilea Iki and Hilea Nui....'" On the other hand, the court noted that MKA bore the burden of producing evidence in support of its motion for summary judgment. However, because MKA, as a defendant in the quiet title action, did not bear the burden of proving title to Hilea Iki or Hilea Nui at trial, it could discharge its initial burden on summary judgment by "pointing out that the record lacks substantial evidence to support a necessary element of the nonmovant's claim." (Quoting 11 *Moore's Federal Practice,* § 56.13[1] (Matthew Bender 3[d] ed.) Thus, the court concluded that MKA was simply required to "establish that [Omerod is] unable to establish a claim to title to an interest in Hilea Nui."

Second, the court concluded that the doctrine of collateral estoppel barred Omerod and Kaluna Appellants' claims to an interest in Hilea Nui. Applying the four-part collateral estoppel test announced in *Dorrance v. Lee,* 90 Hawai'i 143, 148, 976 P.2d 904, 909 (1999), the court ruled that the Boundary Commission judgments entered in 1877 precluded Omerod and Kaluna Appellants' claims in the instant action. According to the court there was a common issue in the two proceedings despite the fact that the issue in the original proceeding was framed as a boundary question while the question in the present action was presented as an issue of ownership. Specifically, the common question was "whether the boundaries of LCA 7715, Apana 14 included only Hilea Iki and not Hilea Nui."

The court also concluded that the Boundary Commission had jurisdiction over the original proceeding, that the judgment in the Boundary Commission proceeding was on the merits and was not appealed, and that the common issue was essential to the judgment in the first case. In summary, the court concluded as a matter of law that *"based upon the Boundary Commission judgment, the boundaries of LCA 7715[:14] are the boundaries of Hilea Iki, [thus, Omerod] and [Kaluna] are collaterally estopped from claiming an interest in Hilea Nui...."* (Emphasis added.)

Third, the court concluded that the judgment in *Okuna* "may preclude certain [Appellants] from asserting any further claim to LCA 7715, Apana 14." The court noted that

under the Stipulated Decree filed in that case, some of the Appellants in the present case "disclaimed any further 'right, title or interest in and to the remainder of Royal Patent 7621, [LCA] 7715, Apana 14[,]" in exchange for "certain interests in real property." Based on "[t]he only reasonable construction" of the Stipulated Decree, the court concluded that those Appellants' claims to Hilea Nui based upon LCA 7715:14 could not "be sustained to the extent that they or their predecessors in interest disclaimed them" in the Stipulated Decree.

## IV.

### A.

On April 1, 2004, Omerod Appellants filed a Motion for Reconsideration arguing, *inter alia*, that the court "used the wrong test for summary judgment, the [f]ederal test[.]" In addition, Omerod Appellants raised the same arguments regarding errors in the Decision and Order that are raised in this appeal. On July 16, 2004, the court denied the Motion for Reconsideration. However, the court did certify Appellants' claims to Hilea Nui pursuant to HRCP Rule 54(b). On November 30, 2004, the court entered the Rule 54(b) Judgment.

### B.

In the summer of 2004, an archaeologist working near Hilea found a book of maps in an abandoned building owned by Appellee C. Brewer. Included in this book was a map drawn by one R.C. Cridge for C. Brewer in 1902. This map showed one ahupua'a boundary (in yellow) surrounding both Hilea Iki and Hilea Nui. Hilea Iki and Hilea Nui were separated by a similar dashed line, but that line was not yellow. Omerod Appellants somehow obtained a copy of the map. Based on this map, on November 30, 2004, Omerod Appellants filed a motion to Alter or Amend the Rule 54(b) Judgment pursuant to HRCP Rules 59(e) and 60(b)(2). The court heard and ruled on this motion on January 13, 2005, concluding that the map was not material to the application of the doctrine of collateral estoppel.

According to the declaration of John Cross [C. Brewer's Vice President of Real Estate], the maps at issue were sugarcane or field maps[, n]ot generated for the purpose of defining tile or boundary issues. The maps at issue apparently were created after the Boundary Commission determinations. *And the maps do not rise to the level of judgments which would supersede the Boundary Commission Judgments.* It is not known what the intent of the cartographer had been with respect to the lines drawn on the map. Specifically, there is no evidence as to what the cartographer relied upon in drawing the maps.

*Therefore the maps do not create genuine issues of material fact that would cause the [c]ourt to alter [its] prior decision regarding the dispositive nature of the Boundary Commission Judgments as a matter of law.*

(Emphases added.)

### C.

In April 2005, Appellants were conducting discovery at C. Brewer's office in Hilo relating to their asserted Native Hawaiian cultural rights in Hilea, whereupon they discovered three additional maps in C. Brewer's possession. Two of these maps were drawn by R.C. Cridge in 1902. Although these additional Cridge maps were not identical to the map found in the summer of 2004, according to Appellants, they show the same "yellow boundary lines again describing Hilea as one ahupua'a. . . ." The "Explanation" on one of these maps stated that it was "reduced from [a] plantation map and drawn by R.C. Cridge with new surveys by J.H. Waipuilani." The third map, designated as "Map 543," "describ[ed] Hilea [N]ui . . . as being LCA 7715 to [Lot] and Hilea [I]ki as being LCA 9971 to Leleiohoku—the opposite of [the court's] issue preclusion summary judgment ruling linking Hilea [I]ki with LCA 7715 and Hilea [N]ui with LCA 9971."

Upon discovery of these additional maps, on May 10, 2005, Omerod Appellants moved for Relief from Judgment and for Sanctions pursuant to HRCP Rule 60(b). The court heard and ruled on the motions on June 9, 2005. In its oral ruling, the court first de-

clared that Mr. Cross, C. Brewer's Vice President for Real Estate, had not committed fraud in failing to produce the Cridge maps in response to Appellants' discovery requests for survey maps. As to the motion for relief based on the newly discovered evidence, the court ruled that the "three additional maps ... would not make a difference in regard to the [c]ourt's prior analysis. The maps would not rise to the level of judgments which would supersede the [B]oundary [C]ommission judgments."

## V.

Omerod Appellants raise five points on appeal. First, that the court erred in granting Appellees' Motion for Summary Judgment against Omerod Appellants "to the extent that [they] claim an interest in Hilea [N]ui under LCA 7715, Apana 14." Second, that the court erred in denying Omerod Appellants' Motion for Summary Judgment with regard to the asserted cotenancy of Lot and Leleiohoku and their respective successors-in-interest. Third, that the court erred in denying Omerod Appellants' Motion for Reconsideration. Fourth, that the court erred in denying Omerod Appellants' Motion to Alter or Amend Judgment and for Sanctions based on the Cridge Maps, which had not been presented to the court at the time of the summary judgment hearing. Fifth, that the court erred in declining to impose sanctions against C. Brewer based on its finding that C. Brewer's Vice President for Real Estate did not commit fraud in his declaration.

Kaheananui Appellants raise three points of error on appeal.

A. The Court Erred in Its Decision When it Applied The Doctrine of Collateral Estoppel As it Relates Back to the Boundary Commission Judgments of 1877 ...

B. [Lot] And Leleiohoku Each Owned an Undivided One–Half (50/50) Interest In The Ahupua'a Of Hilea As Cotenants

C. The Boundary Commission Had No Authority To Alter The Interest Conveyed By Grantor [Lot], Whereby In Effect Its 1877 Judgments Diminished The Interest Of The Grantees, While At The Same Time Increasing The Interest Of That Of [sic]

Leleiohoku And His Successor–In–Interest.

## VI.

Appellants make no arguments regarding the January 16, 2004 Protective Order in their Opening Briefs. Therefore, their appeal of the November 30, 2004 Rule 54(b) Judgment is disregarded to the extent that it challenges the January 16, 2004 Protective Order. *See Norton v. Admin. Dir. of the Court,* 80 Hawai'i 197, 200, 908 P.2d 545, 548 (1995) (citing Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(7) ("Points not argued may be deemed waived.")).

## VII.

### A.

■ To reiterate, in its March 22, 2004 Decision and Order, the court (1) granted summary judgment in favor of MKA and TNC against Omerod and Kaluna "to the extent that [they] claim an interest in Hilea Nui under LCA 7715[:14]"; and (2) denied Omerod's and Kaluna's motions for summary judgment. "An award of summary judgment is reviewed *de novo* under the same standard applied by the circuit court." *Taniguchi v. Ass'n of Apartment Owners of King Manor, Inc.,* 114 Hawai'i 37, 46, 155 P.3d 1138, 1147 (2007) (quoting *French v. Haw. Pizza Hut, Inc.,* 105 Hawai'i 462, 466, 99 P.3d 1046, 1050 (2004) (other citations omitted)). The standard for granting a motion for summary judgment is well settled:

[S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the

light most favorable to the party opposing the motion.

*Id.* (quoting *Bremer v. Weeks,* 104 Hawai'i 43, 51, 85 P.3d 150, 158 (2004) (citations, internal quotation marks, and some brackets omitted)).

### B.

As a threshold issue, we address the contention that the court's citation to *Moore's Federal Practice* indicates that the court used a summary judgment standard inapplicable in this jurisdiction. It did not. The objected to portion of the Decision and Order reads:

> It is true that on [MKA's] Motion for Summary Judgment, [MKA] has the burden of producing evidence to support a motion for summary judgment. However,:
>
> > [i]f the movant does not bear the ultimate burden of persuasion on a particular claim at trial, it may satisfy its initial burden by pointing out that the record lacks substantial evidence to support a necessary element of the nonmovant's claim.
>
> 11 *Moore's Federal Practice,* § 56.13[1] (Matthew Bender [3d] ed.).
>
> As a result, to prevail on [MKA's] Motion for Summary Judgment, all [MKA] must do is establish that [Omerod is] unable to establish a claim to title to an interest in Hilea Nui.

Omerod Appellants contend that the citation to *Moore's Federal Practice* indicates that the court "utilized the wrong standard of law" in that it "weighed evidence using the federal standard[,]" which this court "does not allow." They further argue that this citation to *Moore's Federal Practice* is somehow erroneous because it omits a citation to *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

To support this argument, Omerod Appellants rely on a law review article contrasting the Hawai'i and federal standards for summary judgment. The relevant portion of the article,[13] in discussing *Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), explains that

> in contrast with the approach of Hawaii courts, the Court stated that a trial judge must "bear in mind the actual quantum and quality of proof necessary to support liability" when inquiring as to the existence of a genuine issue of material fact. ... In a striking departure from traditional practices, the Court seemed to invite judges to evaluate the credibility of witnesses and the reliability of evidentiary materials.

Eric K. Yamamoto, et al., *Summary Judgment At The Crossroads: The Impact of the Celotex Trilogy,* 12 U. Haw. L.Rev. 1, 22–23 (Summer 1990) (footnotes omitted).

It is not clear what this article has to do with the objected to citation to *Moore's Federal Practice,* and Omerod Appellants do not elaborate on the point. Thus, it is not apparent how Professor Yamamoto's interpretation of the federal standard as set forth in *Anderson* is equated to the proposition that on summary judgment, the movant bears the ultimate burden of persuasion, but that burden is correlated to the parties' respective burdens of proof at trial.

■■■ Not only is Omerod's contention unsupported, it appears incorrect. Our appellate courts have recognized that "[t]he evidentiary standard required of a moving party in meeting its burden on a summary judgment motion depends on whether the moving party will have the burden of proof on the issue at trial." *Wailuku Agribusiness Co., Inc. v. Ah Sam,* 112 Hawai'i 241, 250, 145 P.3d 784, 793 (App.2006) *affirmed in part and reversed in part,* 114 Hawai'i 24, 155 P.3d 1125 (2007) (citations omitted). Moreover, our courts have cited to both *Moore's Federal Practice* and *Celotex* when discussing the relevant standard for summary judgment. *See, e.g., Pioneer Mill Co., Ltd. v. Dow,* 90 Hawai'i 289, 296, 978 P.2d 727, 734 (1999) (citing *Celotex* ); *GECC Fin. Corp. v. Jaffarian,* 79 Hawai'i 516, 521, 904 P.2d 530, 535 (App. 1995) (citing *Moore's Federal Practice* and *Celotex* ).

---

**13.** Omerod Appellants' brief does not cite to the entire excerpted portion of the article quoted herein. Nor does it indicate by the use of ellipses which portions were omitted in the brief.

Thus, Omerod Appellants' contention that the court's citation to *Moore's Federal Practice* indicates that the court applied an improper standard on summary judgment is not meritorious. Appellants have not shown that the court's conclusion that MKA and TNC were entitled to judgment as a matter of law was wrong.

### C.

With respect to the court's grant of summary judgment in favor of MKA and TNC, Appellants appeal the court's determination that they were collaterally estopped from asserting an interest in Hilea Nui as a result of the 1877 Boundary Commission decisions.[14] As mentioned previously, with regard to this issue, the court ruled:

> The issue presented to the Boundary Commission was the determination of the boundaries of land awarded under LCA 7715, Apana 14. The Boundary Commission had the jurisdiction to make the determination. *Judgment was entered setting forth the boundaries of LCA 7715, Apana 14 as being synonymous with the boundaries of Hilea Iki.* The judgment reflecting the boundary determination was on the merits and was not appealed. The issue addressed in the judgment was essential to

the determination made in the judgment. In fact, the issue addressed was the issue determined in the judgment.

> In this case, [Omerod] and [Kaluna] claim an interest in Hilea Nui as successors in interest *to the award made under LCA 7715, Apana 14. Since, based upon the Boundary Commission judgment, the boundaries of LCA 7715, Apana 14 are the boundaries of Hilea Iki, [Omerod] and [Kaluna] are collaterally estopped from claiming an interest in Hilea Nui as a matter of law.*[15]

(Emphasis added.)

With regard to the application of collateral estoppel, Omerod Appellants' arguments can be grouped thus: (1) the court made erroneous findings of fact with regard to the nature and significance of the conveyances related to Hilea;[16] (2) the court's legal conclusion that Appellants were collaterally estopped from claiming an interest in Hilea Nui by virtue of their interest in Hilea Iki, LCA 7715:14 was wrong;[17] and (3) "the court should have required MKA and TNC to establish paper title to Hilea.[N]ui[ ] before it granted a summary judgment effectively awarding title to Appellees."

The Kaheahanui Appellants make the following arguments: (1) that two mistakes

---

14. Other appellants joined the Opening Briefs submitted by the Omerod and Kaheananui Appellants, and did not submit their own briefs with additional arguments.

15. As noted *supra*, although the Decision and Order refers only to the Omerod and Kaluna Appellants, the Kaheananui Appellants stipulated that they were bound by the law of the case as set forth in the Decision and Order except the portions pertaining to the *Okuna* litigation. *See supra* note 12. Thus, the quoted portion of the Decision and Order also applies to the Kaheananui Appellants.

16. As to this line of argument, Omerod Appellants contend more specifically that: (1) "the [court's] 'Historical–Legal Context' was clearly erroneous and wrong"; (2) "the [court's] 'undisputed facts' and 'salient facts' were in fact disputed, and its resolution of factual disputes showed that genuine issues of fact exist with regard to issue preclusion"; (3) the court's "findings and conclusions in paragraphs IA., B., C., and D(1) and D(2)[ ] of its Decision and Order are clearly erroneous, wrong, and incomplete"; (4) the court "ignored the unique historical context created by the joint conveyance of Hilea in

the 1848 Mahele"; (5) the court "misstated and distorted the historical record"; and (6) the court "quoted and relied on language in the 1873 Boundary Commission petition not contained in that document."

17. As to this point, Omerod Appellants specifically maintain that: (1) "issue preclusion does not apply because the 1877 judgments were ambiguous, there was not identity of issues, the issue of title was not essential to the 1877 judgments, the Boundary Commission lacked jurisdiction, the 1877 judgments were void, and the issues in this lawsuit were neither actually litigated nor finally decided by the Boundary Commission"; (2) "the court did not apply the stricter standards for issue preclusion required where claims involve title disputes or co-tenancy"; (3) "assuming issue identity and jurisdiction, issue preclusion would contravene public policy in this case"; (4) "this case involves issues of public importance and wide application, and should not be resolved by summary judgment"; (5) whether the disclaimer in Civil No. 9073 "applies to Hilea [N]ui is a question of fact for the jury[.]"

were made in the Boundary Commission proceedings, specifically that (a) "the maka'ainana [18] purchasers, presumably unsophisticated ..., mistakenly believed what they purchased was Hilea Iki, a land smaller in size than what they actually purchased, when under the law, they really purchased one-half of the Ahupua'a of Hilea[,]" and (b) the Boundary Commission "played into" the petitioners' mistake when it should have "recognized from the outset that [it was] not presiding over boundary issues, but rather title and ownership issues" over which it did not have jurisdiction; (2) that the Boundary Commission exceeded its authority when it entered its 1877 judgments; [19] and (3) that the Boundary Commission judgments "violated a principle of law" in that they conveyed to "Leleiohoku's successor-in-interest a greater interest than what [he] owned," which Leleiohoku could not have done himself.

Appellants' main argument under the first prong of the summary judgment standard seems to be that they presented a genuine issue of material fact as to whether Kamehameha III awarded Hilea to Lot and Leleiohoku as equal cotenants or as two fee simple awards to two distinct tracts of land (Hilea Iki and Hilea Nui). In their Opening Brief,

Kaheananui Appellants state, "One of the major disputes in this appeal ... has to do with the contention herein that Lot and Leliohoku owned Hilea as 50/50 cotenants; and, consequently the Heirs of Kaheananui, as claimants to Hilea under [LCA] 7715:14 have a co-tenancy claim to the entire Ahupua'a of Hilea." Similarly, Omerod Appellants "claim an undivided 50% interest in a portion of the ahupua'a on the theory that only one ahupua'a called Hilea with two managerial divisions or 'ilis has existed since ancient times and was jointly conveyed in the Mahele of 1848 to [Lot] and ... [Leleiohoku]."

In support of these contentions, Omerod Appellants claim that "[t]here is substantial record evidence that it was the intent of King Kamehameha III ... in the 1848 Mahele to convey jointly one historic ahupua'a called Hilea, which contains two divisions or 'ilis, Hilea [N]ui (1) and Hilea [I]ki (2) to [Lot] and his cousin [and] brother-in-law, [Leleiohoku]." [20] (Internal footnote omitted.)

Further, Omerod Appellants maintain that because the Mahele is considered one simultaneous act despite the fact that the agreements between Kamehameha III and the various ali'i were reached on different days, *see Harris v. Carter*, 6 Haw. 195, 203 (1877), "granting of a joint interest in land to two

---

18. Maka'ainana translates literally as "people that attend the land," meaning "commoner, populace, people in general; citizen, subject." Pukui & Elbert, *Hawaiian Dictionary* 224. Here, the maka'ainanas referred to are the fourteen Native Hawaiians to whom Lot conveyed his interest in Hilea in 1857.

19. As to this point, Kaheananui Appellants argue specifically: (1) "[s]ince the land awarded to both Lot and Leleiohoku was Hilea [through LCAs 7715:14 and 9971:11, respectively], the [B]oundary [C]ommission's duty was to determine the boundary of Hilea, not to further divide Hilea"; (2) "[t]he Boundary Commission had no authority, nor jurisdiction, to mahele Hilea into Hilea Iki and Hilea Nui; and, in the process, redesignate [LCA 7715:14] to be an award of Hilea Iki to [Lot]; and, at the same time, redesignate [LCA 9971:11] to be an award of Hilea Nui to Leleiohoku"; and (3) "the Boundary Commission should have refused to assume jurisdiction and should have dismissed this case" hence, its judgments are null and void.

20. The evidence referred to includes: (1) the observation that Lot and Leleiohoku were both

grandchildren of Kamehameha I, (2) the assertion that "[j]oint ownership of this special ahupua'a between these members of the Kamehameha family properly reflected ancient Hawaiian custom", and (3) the conclusion that "[t]he concept of joint ownership and use of the same ahupua'a, especially among related ali'i was fundamental to the historic Hawai'ian [sic] tradition, a departure from the [w]estern [c]ommon [l]aw concept of exclusive fee simple ownership."

Omerod Appellants contend that further evidence of this type of joint ownership among members of the Kamehameha family is the fact that Kekuanao'a, the father of Lot and Ruth (Leleiohoku's wife and ultimate heir), helped his children perfect their claims and manage their estates. Omerod Appellants rely specifically on the absence of any reference to "separate ahupua'as called Hilea" in Kekuanao'a's records from the 1850s. They reiterate that their argument at summary judgment that Kekuanao'a "undoubtedly went before the Land Commission ... to request that Hilea be awarded [to Lot and Leleiohoku] jointly as one ahupua'a. He would not want to split the ahupua'a and deprive one child of ocean access; splitting the ahupua'a would not be beneficial to his family."

individuals constitutes a conveyance as tenants in common." (Citing *Awa v. Horner*, 5 Haw. 543, 544 (1886); *Petran v. Allencastre*, 91 Hawai'i 545, 551 n. 12, 985 P.2d 1112, 1118 n. 12 (App.1999).)

Omerod Appellants also rely on Leleiohoku's testimony to the Land Commission on February 14, 1848. The testimony was given in Hawaiian. The English translation provides, in pertinent part,

> I hereby state on this paper ... all my claims for land[.]

| The Lands | Type of Land | District | Island |
|---|---|---|---|
| .... | | | |
| 10. Hilea | [Ahupua'a] L. Kamehameha | Kau | [Hawai'i.] |

(Underscoring in original.) Omerod Appellants point specifically to the inscription of Lot's name next to Leleiohoku's claim to Hilea and his additional testimony that "[t]hese lands are for myself and for ourselves[.]" According to Omerod Appellants' expert, Jason D. Cabral, a Professor of Hawaiian Language at the University of Hawai'i at Hilo, "Leleiohoku intended to own one ahupua'a jointly with [Lot]." Professor Cabral concluded that Leleiohoku's statement "for myself and ourselves" "is intended to convey the meaning that those other persons named in the testimony share in the ownership of the property with Leleiohoku. This includes Lot ... in the ahupua'a of Hilea...." (Emphasis omitted.)

Omerod Appellants' other expert witness, Dr. Davianna McGregor, Professor of Hawaiian Historical Culture at the University of Hawai'i at Manoa, opined that "in accordance with Hawaiian traditional and customary use and practice, there was only one ahupua'a of Hilea in Ka'u.... The conveyance of one ahupua'a called Hilea ... jointly to [Lot] and ... Leleiohoku was consistent with the traditional Hawai'ian [sic] land system of stewardship and responsibility...." (Emphasis omitted.)

Additionally, Omerod Appellants rely on the Mahele Book itself. They contend that when Kamehameha III intended to convey different ahupua'as with the same name, "the Mahele Book frequently designates such divisions by inserting a '1' or '2' or 'iki' or 'nui' after the ahupua'a in question." Thus, they maintain that the absence of any such designation with reference to the grants of "Hilea" to Lot and Leleiohoku signifies Kamehameha III's intention to grant a cotenancy in a single ahupua'a.

Finally, in argument, Omerod Appellants list the following individuals and entities who purportedly "describe one 'ahupua'a of Hilea'": (1) King Kamehameha III in the Mahele, (2) Lot in the 1857 deed to fourteen Native Hawaiians, (3) Kekuanao'a in a letter to the Land Commission dated 1849, (4) the Privy Counsel, which approved the allocation of Hilea to Lot and Leleiohoku in 1849, (5) the Land Commission, in its 1855 awards to Lot and Leleiohoku, (6) "at least seven maka'ainana who make kuleana award claims in 1848 and 1849 in 'Hilea,'" (7) John T. Fuller, the surveyor who surveyed the Hilea kuleana awards in 1852, (8) Kekuanao'a's staff, who managed the estates of Lot and Princess Ruth, (9) fourteen Catholic elders "who purchased the interest of [Lot]" and "paid taxes on 'the ahupua'a of Hilea' from 1857 to 1877" and subsequently leased the "'ilis of Hilea [N]ui (1) and Hilea [I]ki (2) in 1864 to Nicholas George," (10) Ruth, in her deed to Colonel Samuel Parker dated 1882, and subsequent deeds from (a) Parker to William Irwin and (b) Parker and Irwin together to Hilea Sugar, both dated 1883, which describe the subject property as "the ahupua'a" of Hilea.

Relatedly, Omerod Appellants object to the portions of the Decision and Order containing what the court denoted as "undisputed facts" (Part I.B. at 246–47, 172 P.3d at 990–91) and "salient facts" (Part I.D. at 248, 172 P.3d at 992)[21] in their entirety.

### D.

Appellee TNC respond that "Appellants have not met their burden with respect to showing a genuine issue of material fact." More specifically, Appellee TNC argues the following. First, that the conveyances of

---

**21.** These sections of the Decision and Order are quoted in their entirety *supra* at 250–52, 172 P.3d at 994–96.

Hilea Iki and Hilea Nui executed after the Mahele but before the Boundary Commission proceedings do not provide competent evidence of cotenancy.[22] Second, that documents related to conveyances after the Boundary Commission proceedings are not competent evidence of cotenancy.[23] Third, that miscellaneous documents that are not contemporary with the Mahele and are not related to title issues do not raise a genuine issue of material fact regarding the existence of a cotenancy.[24]

Appellees Olson and C. Brewer respond that "[a]lthough Appellants accuse [the court] of relying on 'disputed facts' in [its] ... Decision and Order, ... they fail to identify the disputed facts 'material' to [the court's] holding that Appellants are precluded by prior proceedings to make claims to Hilea Nui (LCA 9711:11) under the single ahupua'a theory." Appellees Olson and C. Brewer contend that "not every disputed fact is 'genuine issue of material fact' just because Appellants disagree...."[25] They point out that "[a] fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." (Quoting *Price v. AIG Haw. Ins. Co.*, 107 Hawai'i

106, 110, 111 P.3d 1, 5 (2005).) Appellees Olson and C. Brewer further argue that "even if all of the 'disputes' were resolved in Appellants' favor, nothing would change the fact that the Land Commission and Boundary Commission ... issued final judgments on the merits."

Appellees Olson and C. Brewer assert that the Cridge maps were "not material to questions of ... collateral estoppel[ ]" inasmuch as: (1) they "were never recorded or used to convey or determine title" and (2) "[t]hey had no legal effect on the Land and Boundary Commission judgments...." Finally, Appellees Olson and C. Brewer note that Appellants' reliance on the altered 1882 deed from Ruth to Parker cannot create a genuine issue of material fact because "Appellees fail to articulate how this [alteration] would have affected the binding Land and Boundary Commission judgments."

E.

In their reply to TNC, Omerod Appellants (1) contend that they "do not challenge the finality of those proceedings [but] they do dispute their meaning and significance[,]" (2)

---

**22.** More specifically, Appellee TNC argues: (1) "the 1857 deed ... does not create a genuine issue of material fact with respect to Appellants' co-tenancy claim[ ]" because "the deed's recitation of the 'entire right in and to the Ahupuaa of Hilea' does not make Lot a co-tenant owner of the land separately awarded to Leleiohoku[,]" and (2) the 1864 lease of Hilea Iki to Nicholas George does not create a genuine issue of material fact as to the existence of a co-tenancy because it "does not prove that Kahaku owned the Hilea covered by LCA No. 9971 to Leleiohoku" in addition to the interest in the Hilea covered by LCA 7715:14 to Lot that Kahaku held by virtue of the 1857 deed from Lot.

**23.** As to this point, Appellee TNC argues that the alterations on the 1882 deed conveying Ruth's interest in Hilea Nui to Parker do not create a genuine issue of material fact because "[e]ven if the deed had been altered after the fact, such alteration would not affect the validity or finality of the [LCA] and Boundary Commission judgment with respect to Hilea Nui[,]" thereby creating a co-tenancy.

**24.** With regard to this point, Appellee TNC argues that (1) "Governor Kekuanao'a's estate book ... does not create a genuine issue of

material fact with respect to Appellants' co-tenancy claim[ ]" because all it shows is that "Ruth's Hilea (LCA No 9971 inherited from her deceased husband, Leleiohoku) was distinct from and separately accounted [for] from the Hilea owned by Lot[,]" and (2) the Cridge maps do not create a genuine issue of material fact with regard to the co-tenancy claim because the preparer "was not engaged in preparing a land title survey and ... he could not change the effect of the [LCAs] and the Boundary Commission's determinations."

**25.** Appellees Olson and C. Brewer list the following documents relied upon by Appellants "to create 'disputed issues of fact'" as not being material to the court's ruling in its Decision and Order: (1) entries in the Mahele Book, (2) Leleiohoku's testimony to the Land Commission and Professor Cabral's testimony regarding its translation, (3) Professor McGregor's testimony regarding the inadequacies of Hilea Iki as a traditional ahupua'a, (4) records of income collected from the lands, (5) an 1851 government memorandum designated some lands as "settled" and others as still pending before the Land Commission, (6) tax records showing that the fourteen individuals who purchased Lot's interest in Hilea paid property taxes, and (7) the 1864 lease from Lot's successors to Nicholas George.

seem to assert that the Boundary Commission acted without jurisdiction in 1877 because the parties were untimely in filing their petitions or because title was disputed, (3) argue that the issues in the current litigation were not adjudicated by the Boundary Commission inasmuch as the court stated that "[t]he Boundary Commission judgments . . involved a determination of boundaries of land and this case involves a determination or ownership interests in land[,]" such that the issues raised in the present quiet title action were "neither litigated nor resolved" in 1877, (4) reiterate that this suit implicates "important policy questions regarding [the] Mahele, Land Commission and Boundary Commission proceedings" that should not have been resolved through summary judgment, (5) restate arguments related to the court's grant of summary judgment in favor of Appellees asserted in their Opening Brief,[26] (6) claim that Appellees' answering briefs "attempt[ ] to validate" the courts findings "tacitly acknowledg[ing] that the [court] . . . usurped the jury's role[ ] by weighing conflicting evidence and determining the intent of King Kamehameha III, the Land Commission, and the parties regarding the title to Hilea,". (7) argue that the court's finding, which TNC reiterated in its Answering Brief, that Hilea has always been treated as two ahupua'as, is disputed by "substantial material facts in the record[,]" (8) claim that the court did not analyze "controlling case law regarding the Land Commission[,]"[27] (9)

**26.** The arguments as to this point repeated from the Opening Brief include (1) the assertion that the court improperly weighed historical evidence in order to arrive at the "undisputed facts" and "salient facts" upon which the Decision and Order was based, (2) the recounting of evidence explaining the particular historical and cultural context of Hilea, which they claim supports their theory that there is only one ahupua'a, and (3) the reiteration of evidence that the Omerod Appellants' ancestors, Ruth, and her assigns treated Hilea as one ahupua'a.

**27.** This argument seems to have been raised for the first time in the Reply Brief. As to this point, Omerod Appellants cite to *Pa Pelekane*, to support their contention that "extrinsic evidence" should be received by the court to determine the correct boundaries of Hilea. They "seek to determine the 'identity and extent of the Mahele grants and [LCAs] of Hilea with the aid of extrinsic evidence exactly in the fashion contemplated by *Pa Pelekane*." Omerod Appellants also cite to *Ke'elikolani v. Robinson*, 2 Haw. 522 (1862), *Kanaina v. Long*, 3 Haw. 332 (1872) (en banc), and *Harris*, 6 Haw. 195, claiming that these cases also support Appellants' position that the court should make an exception to the general rule that "an award of the ahupua'a by the Land Commission carries with it everything within the ahupua'a boundaries[ ]" in this case.

Omerod Appellants urge this court to "look[ ] back to the Mahele to determine the intent of the King regarding Hilea" as they claim this court did in *Ke'elikolani*. According to them, in that case, this court "reviewed the underlying historical context of [the] particular grant [at issue] at the Mahele and the circumstances surrounding use of [the contested property] before and since." Omerod Appellants further contend that this court in *Kanaina* held that a LCA entered by name only was not "intended to carry with it all the land within its borders." Omerod Appellants cite to the holding in *Harris*, 6 Haw. at 207, that

"all the Ilis that were recognized and treated in the mahele ... were ... 'Ili Kuponos[,]" (alteration omitted) (ellipses in original) to counter Appellee C. Brewer's argument that Hilea was "one or more 'ili kupono[.]"

Finally, Omerod Appellants quote *State v. Hawaiian Dredging*, 48 Haw. 152, 176, 397 P.2d 593, 607 (1964) ("If considered ambiguous, the construction given a deed [or, by analogy, a LCA] by the parties to it will be given effect unless it contravenes some rule of law.") (Citations omitted.). Omerod Appellants maintain that *Hawaiian Dredging* requires that "[i]f it is not clear Hilea is just one ahupua'a, the question of intent regarding the scope of the Hilea awards at the Land Commission is for the jury." (Citations omitted.) Thus, they contend that they have raised a genuine issue of material fact that would preclude summary judgment because "it [is] unclear what the grantee [was] intended to acquire[.]"

Inasmuch as we disregard points on appeal that are not presented in compliance with HRAP Rule 28, *see infra* at 261–62, 172 P.3d at 1005–1006, we need not address the merits of this argument. We do note, however, that *Pa Pelekane* did not hold that extrinsic evidence should be admitted to determine the *boundaries* of the award of Paunau to Victoria Kamamalu (Victoria), but rather, to determine whether Pa Pelekane had been reserved to the government prior to the Mahele such that it would not have been included in Paunau when that land was conveyed to Victoria. *Pa Pelekane*, 21 Haw. at 186 ("Any admissible evidence ... tending to show that ... Pa Pelekane, though originally a part of Paunau was not included in the award of that ahupuaa, should be received.") Unlike the Territory of Hawai'i in *Pa Pelekane*, which sought to prove that ownership of Pa Pelekane never passed to Victoria, Omerod Appellants essentially seek a determination that the Boundary Commission erred when it determined that LCA 7715:14 and LCA 9971:11 had different boundaries.

argue that the court erred when it ruled that the settlement in *Okuna* "may" have precluded the present litigation.[28]

In their reply to C. Brewer, Omerod Appellants contend that (1) C. Brewer attempts to mislead this court by raising arguments regarding claim preclusion, a theory rejected by the court and (2) C. Brewer "abandoned and waived" any arguments contradicting Appellants' claims that the court improperly denied Appellants' motion for summary judgment.

On June 18, 2007, Omerod Appellants filed a Citation to Supplemental Authority relating to *Wailuku Agribusiness v. Ah Sam*, 114 Hawai'i 24, 155 P.3d 1125 (2007) *reconsideration denied*, 114 Hawai'i 55, 155 P.3d 1156 (2007). They contend that *Wailuku Agribusiness* requires "summary reversal of [the court's] grant of summary judgment" in favor of Appellees. Omerod Appellants cite *Wailuku Agribusiness* for the proposition that "[e]vidence from publicly filed documents, viewed in the light most favorable to Petitioners ... suggests a cotenancy may exist." (Quoting *Wailuku Agribusiness*, 114 Hawai'i at 36, 155 P.3d at 1137). Omerod Appellants further rely on the statement that "assuming a cotenancy existed, it was incumbent upon Wailuku to prove it acted in good faith towards cotenants[.]" (Quoting *Wailuku Agribusiness*, 114 Hawai'i at 35, 155 P.3d at 1136) (alteration omitted).[29]

## VIII.

Under the first prong of the summary judgment standard, Appellants must demonstrate that there were genuine issues of material fact that necessitated a trial. With all due respect, regarding this point, Appellants' briefs fail to meet the requirements of HRAP

---

Secondly, *Ke'elikolani* is distinguishable from this case because the subject property (Pakaka), was held to be of the "new class of real property which was not covered by the law of 1839, the Great Division [the Mahele], nor the rules affecting ordinary *kuleanas*[,]" such that it could not have passed to Queen Kalama as part of the ahupua'a of Waikahalulu, which was allotted to her in the Mahele. *Ke'elikolani*, 2 Haw. at 548. In contrast, the parties to this case acknowledge that Hilea Iki and Hilea Nui were of the class of lands covered by the Mahele. Thus, the law pertaining to and flowing logically from the Mahele, including the finality of Boundary Commission judgments, applies in this case. *Kanaina* is likewise distinguishable in that it held that Kanaina, as Queen Kalama's heir, did not hold title to the subject property because "house lots" were not included in a Mahele award of an 'ili inasmuch as they were specifically excluded by statute. *Kanaina*, 3 Haw. at 338.

Third, it is not clear how the citation to *Harris* supports Appellants' petition. The portion of the decision Appellants cite explains that the 'ilis granted in the Mahele were 'ili kuponos, or 'ili that did. not owe tribute to the holder of the ahupua'a, as distinct from 'ilis of the ahupua'a, which did pay tribute. *Harris*, 6 Haw. at 206–07. This court went on to explain that the "kupono" designation was not utilized in the Mahele because once an 'ili was separated from the ahupua'a, the distinction was not necessary. *Id.* at 207. Appellants do not explain how this relates to Appellee C. Brewer's contention that Hilea was one or more 'ili kuponos.

Fourth, *Hawaiian Dredging* is inapplicable to this case because it considered the scope of a LCA that apparently had not been reduced to a Boundary Commission judgment or Royal Pat-

ent, which would have defined the boundaries of what was included in the award.

28. As to this point, Omerod Appellants maintain (1) "[t]he facts clearly establish" that they "did not disclaim or waive their ownership interests ... in Hilea Nui mauka of the Old Government Road that is the subject matter of this lawsuit" and (2) the court ignored the clear intent of the parties in *Okuna* that Omerod Appellants only relinquished their claim to any additional interest in Hilea Iki.

29. On July 12, 2007, Appellee Olson filed a Motion to Strike Citation of Supplemental Authority objecting to this letter on the basis that it contained argument, in violation of HRAP Rule 28(j) (2007), which allows parties to "bring to the appellate court's attention pertinent and significant authorities published after a party's brief has been filed but before a decision.... The letter shall, *without argument*, state the reasons for the supplemental citations." (Emphasis added). On July 19, 2007, Omerod Appellants filed their opposition to the motion to strike, contending that what Appellee Olson had characterized as prohibited argument was merely "a detailed discussion explaining the applicability of the *Wailuku* opinion." Appellants argued that the June 18, 2007 letter complied with HRAP Rule 28(j) because the "explanation" of the relevance of *Wailuku* did not constitute "extensive argument" and did not "raise additional points." On July 24, 2007, we granted Appellee Olson's Motion to Strike Citation of Supplemental Authority, without prejudice to filing a citation to supplemental authority in compliance with HRAP 28(j). To date, Appellants have not filed a compliant citation to supplemental authority.

Rule 28(b) and, therefore, will be disregarded.

HRAP Rule 28(b) mandates:

**(b) Opening brief.** Within 40 days after the filing of the record on appeal, the appellant shall file an opening brief, containing the following sections in the order here indicated:

. . . .

(3) A concise statement of the case, setting forth the nature of the case, the course and disposition of the proceedings in the court or agency appealed from, and the facts material to consideration of the questions and points presented, with record references supporting each statement of fact or mention of court or agency proceedings. In presenting those material facts, all supporting and contradictory evidence shall be presented in a summary fashion, with appropriate record references. . . .

(4) A concise statement of the points of error set forth in separately numbered paragraph. Each point shall state: (i) the alleged error committed by the court or agency, (ii) where in the record the alleged error occurred; and (iii) where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court or agency. Where applicable, each point shall include the following:

. . . .

(C) *when the point involves a finding or conclusion of the court or agency, a quotation of the finding or conclusion urged as error*[.]

. . . .

*Points not presented in accordance with this section will be disregarded, except that the appellate court, at its option, may notice a plain error not presented.* Lengthy parts of the transcripts that are material to points presented may be included in the appendix instead of being quoted in the point.

(Emphases added.) Appellants' briefs do not meet these requirements for different reasons.

 The Kaheananui Heirs' Opening Brief is deficient in that the Statement of Points of Errors Section fails to note "where in the record the alleged error[s] occurred" and "where in the record the alleged error[s were] objected to . . . or brought to the attention of the court[.]" HRAP Rule 28(b)(4)(ii), (iii). Kaheananui Appellants simply list their disagreements with the court's decision. Additionally, the Kaheananui Heirs' Opening Brief fails to quote any finding or conclusion "urged as error." HRAP Rule 28(b)(4)(C). Appellants are required to do more than assert bald points of error under HRAP Rule 28(b)(4). Kaheananui Appellants' cursory treatment of the points of appeal [30] cannot reasonably be considered compliant with HRAP Rule 28(b)(4).

---

30. The entirety of the "Statements of the Points of Error" section in Kaheananui Appellants' Opening Brief reads:

 A. The court erred in its decision when it applied the doctrine of collateral estoppel as it relates back to the Boundary Commission judgments of 1877; instead, the court should have found that the Boundary Commission acted without jurisdiction or authority when rendering the judgments, and consequently, the court necessarily should have ruled that the judgments were null and void.

 1. The court erred and should have ruled that the Boundary Commission was without jurisdiction or authority because by the grant of the ahupua'a of Hilea it was intended that both [Lot] and Leleiohoku be assigned whatever was included in such tract according to its boundaries as known and used from ancient times, and therefore, the Boundary Commission should have determined the boundaries of Hilea and not the boundaries of Hilea Iki and Hilea Nui.

 2. The court erred and should have ruled that the Boundary Commission overstepped its authority and exceeded its jurisdiction, by hearing the case and then rendering a judgment as to the boundaries of Hilea Iki and Hilea Nui and therefore the judgment is necessarily not according to law and must be voided.

 a. The Boundary Commission's duty was to determine the boundary of the ahupua'a of Hilea, not the boundaries of Hilea Iki and Hilea Nui.

 b. The Boundary Commission did not have authority to Mahele Hilea into Hilea Iki and Hilea Nui.

 c. The Boundary Commission judgments of 1877 are null and void, since lacking jurisdiction, the Boundary Commission should have dismissed the case.

■ Omerod Appellants' Opening Brief suffers from the opposite defect. With all due respect, their statement of points on appeal are presented in a narrative that is more accurately described as argument and cannot be called "summary." *See* HRAP Rule 28(b)(3). Moreover, citing to the entire factual portion of the Decision and Order as erroneous, with no elaboration as to the nature of the errors, ignores the proper role of the appellate process.[31] *See Wright v. Chatman*, 2 Haw.App. 74, 76, 625 P.2d 1060, 1062 (1981) ("Noncompliance forces this court to speculate on the what and the why of the appeal. It also forces us to do the work that is more properly done by the appellant."). Further, this court is not obligated to sift through the record, which in this case comprises nineteen volumes totaling more than 6,000 pages, in order to determine the specific nature of the errors asserted but not documented. *Lanai Co., Inc. v. Land Use Comm'n*, 105 Hawai'i 296, 309 n. 31, 97 P.3d 372, 385 n. 31 (2004) ("This court is not obligated to sift through the voluminous record to verify an appellant's inadequately documented contentions." (Citing *Miyamoto v. Lum*, 104 Hawai'i 1, 11 n. 14, 84 P.3d 509, 519 n. 14 (2004)); *Traders Travel Int'l, Inc. v. Howser*, 69 Haw. 609, 616, 753 P.2d 244, 248 (1988)). Thus, the statement of points of error as they pertain to the Decision and Order do not comply with HRAP Rule 28(b)(4).

Based on the foregoing, the alleged points of error regarding the Decision and Order

will be disregarded. HRAP Rule 28(b)(4) ("Points not presented in accordance with [HRAP Rule 28] will be disregarded, except that the appellate court, at its option, may notice a plain error not presented."); *Sprague v. Cal. Pac. Bankers & Ins. Ltd.*, 102 Hawai'i 189, 195, 74 P.3d 12, 18 (2003) ("It is within the appellate court's discretion whether to recognize points not presented in accordance with HRAP Rule 28(b)(4).").

## IX.

### A.

■ While we understand Appellants' arguments regarding the importance of historical context in interpreting the significance and effect of land transactions in Hawai'i, we are nonetheless bound by the decisions of the Boundary Commission. On that point, we note that there was evidence supporting summary judgment on the basis of collateral estoppel against Appellants in this case.

> Collateral estoppel is an aspect of *res judicata* which precludes the relitigation of a fact or issue which was previously determined in a *prior suit* on a different claim between the same parties or their privies.... Collateral estoppel also precludes relitigation of facts or issues previously determined when it is raised defensively by one not a party in a *prior suit* against one who was party in that suit and who

---

C. [Lot] and Leleiohoku each owned an undivided one-half (50/50) interest in the ahupua'a of Hilea as cotenants.

D. The Boundary Commission had no authority to alter the interest conveyed by Grantor [Lot] whereby in effect its 1877 judgments diminished the interest of the grantees, while at the same time increasing the interest of that of [sic] Leleiohoku and his successor-in-interest.

(Capitalization deleted.)

**31.** Not only do Omerod Appellants cite to the entire factual section of the Decision and Order, such that this court would be required to delve into the fact and argument sections to determine exactly which facts Omerod Appellants object to and why, their citation to the entire fact section is inappropriate. For example, Omerod Appellants state that "[Lot] and ... Leleiohoku[ ] ... were granted the entire ahupua'a of Hilea ... in the historic 1848 Mahele." In support of this

statement, Omerod Appellants present a certified photocopy of the Mahele Book showing that Lot was allotted Hilea on January 27, 1848. Obviously, this contradicts Omerod Appellants' contention that paragraph I.B. of the Decision and Order was erroneous inasmuch as the first sentence of that paragraph states, "On January 27, 1848, pursuant to the Mahele, land identified as 'Hilea' was allotted to [Lot]."

This is one example of the inaccuracy of Omerod Appellants' statement of errors. No attempt was made to compare the entirety of their briefs to each alleged point of factual error, inasmuch as it would have been an unwarranted expenditure of time, given the disposition of this appeal, and Omerod Appellants' overly broad assertion that all of section I of the Decision and Order, most of which sets forth accepted historical facts, was erroneous.

himself raised and litigated the fact or issue.

*Dorrance*, 90 Hawai'i at 148, 976 P.2d at 909 (citations omitted) (emphases and ellipsis in original). The doctrine of res judicata, including collateral estoppel, bars relitigation when: (1) the issue in the present action is identical to the one in the prior adjudication, "(2) there was a final judgment on the merits, and (3) the party against whom res judicata is asserted was a party or in privity with a party to the prior adjudication." *Id.* (citations omitted).

 Collateral estoppel, the issue preclusion branch of res judicata, differs from claim preclusion in that it "applies to a subsequent suit between the parties or their privies on a *different* cause of action and prevents the parties or their privies from relitigating *any issue* that was actually litigated and finally decided in the earlier action." *Id.* (citation omitted). In light of this difference, this court in *Dorrance* added a fourth element to the res judicata test that applies only to collateral estoppel, that 'the particular issue of fact or law that was decided in the prior adjudication [must] be essential to the earlier valid and final judgment." *Id.* at 149, 976 P.2d at 910.

 In its entirety, then, the test for collateral estoppel requires that:

(1) the issue decided in the prior adjudication is identical to the one presented in the action in question; (2) there is a final judgment on the merits; (3) the issue decided in the prior adjudication was essential to the final judgment; and (4) the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication[.]

*Id.*

### B.

As to the threshold issue of jurisdiction, we conclude that the Boundary Commission had jurisdiction to consider the petition to settle the boundaries of Hilea Iki. Omerod Appellants contend that the "Boundary Commission lacked subject matter jurisdiction to determine title or ownership where there were overlapping title claims to Hilea [N]ui" and

that "the transcript of the 1873 Boundary [Commission] proceedings suggests [that] the parties to that proceeding had overlapping claims . . . ." Additionally, they argue that the petition to settle the boundaries of Hilea Iki was filed after the deadline for filing codified in "An Act to Provide for the Appointment of Boundary Commissioners" (1862 legislation) and extended in "An Act to Facilitate the Settlement of Boundaries, by the Appointment of Commissioners, and Extend the Term of the Commission of Boundaries Established by an Act Approved 23d August 1862" (1868 legislation), and before the second extension codified in "An Act to Further Extend the Term of the Commission of Boundaries" (1874 legislation) was enacted.

First, Omerod Appellants' assertion that there were overlapping claims to Hilea Nui is unpersuasive inasmuch as the petition to settle the boundaries of Hilea Iki identifies Ruth as the sole owner of Hilea Nui, an adjoining tract of land, and makes no claim to any part of Hilea Nui on the part of the petitioners. See *supra* at 250–51, 172 P.3d at 994–95.

Second, the reproduction of the 1868 Legislation appended to Omerod Appellants' Opening Brief is inaccurate. The actual text of the 1868 legislation mandates that the "continuance of the [Boundary Commission] . . . be . . . extended to the 23d day of August, *1874*[,]" not to "the 23d day of August *1873*," as erroneously stated in Omerod Appellants' copy of the legislation. (Emphases added.) Thus, Omerod Appellants' contention that the Boundary Commission lacked jurisdiction over the petition to settle the boundaries of Hilea Iki because the petition was filed after August 23, 1873, but before the 1874 Legislation was enacted, is without merit.

### C.

Appellee MKA's motion for summary judgment was supported by the following exhibits: (1) pages from the Mahele Book showing that lands denominated "Hilea" were allotted to Lot and Leleiohoku; (2) LCA 7715, Parcels 14 and 15, stating that Lot applied "for his lands of Hilea and Punaluu, some Ahupuaa at Kau" (underscoring in original); (3)

LCA 9971, Parcels 11, 12, 13, and 14 to Leleiohoku, showing that he applied "for his lands of Hilea, Hionomoa[, and] Kauhuuhuula, some <u>Ahupuaa</u> at Kau" (underscoring in original); (4) the May 5, 1857 deed from Lot to fourteen individuals conveying Lot's "entire right in and to the <u>Ahupuaa</u> of Hilea, Kau, Hawai'i, awarded to [him] by the [Land Commission] by [LCA] No. 7715, Parcel 14 (underscoring in original); (5) the Boundary Petitions, testimony, and Boundary Commission judgments related to LCA 7715:14 and LCA 9711:11; (6) Omerod Appellants' predecessors' motion for partial summary judgment filed in *Okuna*, claiming an interest in Hilea Iki through LCA 7715:14; (7) the Findings of Fact and Conclusions of Law entered in *Okuna*, concluding that Omerod Appellants' predecessors owned an interest in the disputed land at Hilea Iki through Royal Patent 7621, LCA 7715:14; (8) a partial transcript of proceedings from *Okuna* in which Omerod Appellants' counsel, who represented the defendants (their predecessors in interest) in that action, informed the court that as part of the settlement of *Okuna*, the predecessors of Omerod and Kaluna Appellants accepted an undivided 100 acre portion of Hilea Iki; (9) the Final Amended Partial Judgment entered in *Okuna*, memorializing that Omerod and Kaluna Appellants' predecessors accepted a 100 acre undivided interest in Hilea Iki and "disclaim[ed] any further right [to] title and interest in and to the remainder of LCA 7715, Apana 14[ ]"; (10) the obituary of Basil Apiki, a party in *Okuna*, showing that he was survived by Clara Omerod, an appellant in this case; and (11) the obituary of Julia Nohokula Molele, a party in *Okuna*, showing that 'she was survived by Rowena K. Kaulia and Clara Omerod, appellants in this case. The first four exhibits described above were actually first provided to the court by Omerod Appellants as attachments to the Amended Complaint. Thus, Appellee MKA supported its motion for summary judgment with a historical and legal record sufficient for the court to determine that no genuine issue of material fact existed as to Appellants' ability to prove title to Hilea Nui through LCA 7715:14 and that Appellees were entitled to judgment as a matter of law.

■ Omerod Appellants' argument that there is no identity of issues between the Boundary Commission proceedings and this case because "the 1877 Boundary Commission judgments rendered no opinion about title or ownership of any land involved in this case" is unpersuasive.[32] We agree with the court that there was a common issue in the two proceedings despite the fact that the issue in the original proceeding was framed as a boundary question. Specifically, the common question was "whether the boundaries of LCA 7715, Apana 14 included only Hilea Iki and not Hilea Nui."

As we understand their argument, Omerod Appellants contend that the Boundary Commission was not presented with an issue of "ownership" because it was not petitioned to determine the state of title to Hilea. However, the Boundary Commission judgment determined, by metes and bounds, precisely what land the petitioners "owned" pursuant to LCA 7715:14 and the May 5, 1857 deed from Lot. As noted *supra* at 248–49, 172 P.3d at 992–93, Boundary Commission judgments were the only way to conclusively establish the boundaries of land awarded by name only during the Mahele. *Liliuokalani*, 14 Haw. at 105 (Thomas Fitch, Esq., concurring). Thus, the Boundary Commission proceedings and the present litigation present an identical issue, to wit, what lands were covered by the grant of Hilea to Lot, pursuant to the Mahele and LCA 7715:14.

We note that the parties do not dispute that separate Boundary Commission judgments, describing Hilea Iki and Hilea Nui by

---

32. The legislation establishing the Boundary Commission required it to notify any owners of the land that was the subject of a petition and of adjoining lands of the pending hearing. At the hearing, the Boundary Commission was to "receive ... all the testimony offered, ... go on the ground when required by either party, and ... endeavor otherwise to obtain all information possible to arrive at a just decision as to the boundaries of said lands." Upon gathering all this information, the Boundary Commission was authorized to render a decision "describ[ing] the boundaries decided on, by survey, by natural topographical features, or by permanent boundary marks, or partly by each...."

metes and bounds, were entered and not appealed. These separate judgments indicate that the boundaries of these two tracts of land were not identical. Thus, Hilea Iki and Hilea Nui could not be a single ahupua'a, but must be discrete adjoining properties under the judgments.

██ As noted *supra* at 252–53, 172 P.3d at 996–97, the court concluded in its Decision and Order that all four prongs of the *Dorrance* test were met in this case inasmuch as: (1) the issue presented to the Boundary Commission and the court was the same, namely, what land constituted LCA 7715:14; (2) the Boundary Commission's decision "was on the merits and was not appealed"; (3) the issue addressed by the Boundary Commission was essential to the judgment in that it was the central issue presented to the Boundary Commission; and (4) the parties against whom collateral estoppel were privies to the parties in the Boundary Commission proceedings as their successors-in-interest to real estate.[33] Thus, the court correctly concluded that Appellants were "collaterally estopped from claiming an interest in Hilea Nui as a matter of law."[34]

### D.

As noted *supra* at footnote 29, we ordered Omerod Appellants' supplemental citation to *Wailuku Agribusiness* to be stricken for failure to comply with HRAP Rule 28(j). However, we observe that our decision in *Wailuku Agribusiness* does not support Appellants' contention that the court erroneously granted summary judgment in favor of Appellees. *Wailuku Agribusiness* addressed the propriety of a grant of summary judgment in favor of a plaintiff based on a theory of adverse possession. 114 Hawai'i at 27, 155 P.3d at 1128. We noted that "where a cotenancy exists there is a 'special burden in proving hostile possession' that requires the cotenants making a claim of adverse possession 'to show that they had acted in good faith in relation to their cotenants.'" *Id.* at 34, 155 P.3d at 1135 (quoting *Morinoue v. Roy,* 86 Hawai'i 76, 82, 947 P.2d 944 950 (1997) (citing *City & County of Honolulu v. Bennett,* 57 Haw. 195, 209, 552 P.2d 1380, 1390 (1976)). We ultimately held that "[b]ased on the record, genuine issues of material fact remain as to whether Wailuku acted in good faith towards its purported cotenants in [the subject property]." *Id.* at 35, 155 P.3d at 1136. This holding was based on an *assumption* that a contenancy existed in the subject property. *See id.* ("[A]ssuming a cotenancy existed, it was incumbent upon Wailuku to prove it acted in good faith towards cotenants upon claiming adverse possession.") Thus, inasmuch as summary judgment in this case was not based on the prevailing party's claim to title by adverse possession, the court did not err in not requiring Appellees to prove that they had acted in good faith toward their putative cotenants.

### X.

Inasmuch as we have determined on appeal that the grant of summary judgment in

---

**33.** The portion of the Decision and Order paraphrased here is quoted *supra* at 256, 172 P.3d at 1000.

**34.** In effect, this pertains to the following issues on appeal designated by Appellants. As recited in Omerod's Opening Brief: (1) "issue preclusion does not apply because the 1877 judgments were ambiguous, there was no identity of issues, the issue of title was not essential to the 1877 judgments, the Boundary Commission lacked jurisdiction, the 1877 judgments were void, and the issues in this lawsuit were neither actually litigated nor finally decided by the Boundary Commission[,]" (2) "the court did not apply the stricter standards for issue preclusion required where claims involve title disputes or co-tenancy[,]" (3) "issue preclusion would contravene public policy in this case[,]" (4) "this case involves issues of public importance and wide application and should not be resolved by summary judgment[,]" (5) "the court should have required Appellees to establish paper title to Hilea [N]ui[] before it granted a summary judgment effectively awarding title to Appellees."

As framed by Kaheananui Appellants: (1) "[t]he court erred in its decision when it applied the doctrine of collateral estoppel as it relates back to the Boundary Commission judgments of 1877[,]" (2) "[Lot] and Leleiohoku each owned an undivided one-half (50/50) interest in the ahupua'a of Hilea as cotenants[,]" and (3) "[t]he Boundary Commission had no authority to alter the interest conveyed by ... [Lot], whereby in effect its 1877 judgments diminished the interest of the grantees, while at the same time increasing the interest of ... Leleiohoku and his successor-in-interest." (Capitalization omitted.)

favor of Appellees was proper under the circumstances, there is no need to address the arguments relating to the preclusive effect of the Stipulated Decree in the *Okuna* action. Even assuming, *arguendo*, that the court erred in its conclusion that the Stipulated Decree prevented at least some of the Appellants from raising any claim to Hilea Nui through LCA 7715:14, such error would not alter the court's conclusion that the Appellants are collaterally estopped from raising such a claim by virtue of the preclusive effect of the Boundary Commission judgments.

## XI.

Next, we address Omerod Appellants' contention that in granting summary judgment, the court in fact granted title to Hilea Nui to Appellees without requiring them to make a prima facie showing of title. As to this issue, Omerod Appellants appear to argue that the court applied the wrong standard on summary judgment.

Specifically, Omerod Appellants cite to the burden of proof required on summary judgment as stated in *Pioneer Mill*. In that case, this court announced that

the moving party bears the ultimate burden of persuasion. This burden always remains with the moving party and requires the moving party to convince the court that no genuine issue of material fact exists and that the moving party is entitled to summary judgment as a matter of law.

The moving party's burden of proof is a stringent one, since the inferences to be drawn from the underlying facts alleged in the relevant materials considered by the court in deciding the motion must be viewed in the light most favorable to the non-moving party, and any doubt concerning the propriety of granting the motion should be resolved in favor of the non-moving party.

The evidentiary standard required of a moving party in meeting its burden on a summary judgment motion depends on whether the moving party will have the burden of proof on the issue at trial.

90 Hawai'i at 296, 978 P.2d at 734 (emphasis and internal citations omitted). Thus, according to Omerod Appellants, "[t]he movant . . . must show prima facie title to the land in dispute." (Citing *Maui Land & Pineapple v. Infiesto*, 76 Hawai'i 402, 407, 879 P.2d 507, 512 (1994).) Omerod Appellants conclude that "if the case went to trial there would be no competent evidence to support a judgment for his or her opponent." (Quoting *Sprague*, 102 Hawai'i at 202, 74 P.3d at 25.)

Based on the foregoing authorities, Omerod Appellants argue that the court incorrectly ruled "that Appellees do not bear the ultimate burden of persuasion on their claim to Hilea [N]ui at trial ." They contend that "[t]hat may be the federal *Celotex* rule. The combined proof required by *Pioneer [Mill]* and *Maui Land[ & Pineapple]* should be the Hawai'i rule, regardless of who the movant is."

Omerod Appellants' reliance on *Pioneer Mill*, *Sprague*, and *Maui Land & Pineapple* is misplaced. First, the combined effect of these cases does not result in a higher standard for summary judgment than the court employed. *Pioneer Mill* clearly states that the party moving for summary judgment must show that no "genuine issue of material fact exists and that the moving party is entitled to summary judgment as a matter of law." *Pioneer Mill*, 90 Hawai'i at 296, 978 P.2d at 734. Moreover, "[t]he evidentiary standard required of a moving party in meeting its burden on a summary judgment motion depends on whether the moving party will have the burden of proof on the issue at trial." *Id.* Thus, in their motion for summary judgment, Appellees were required to show that there was no genuine issue of material fact and they were entitled to judgment as a matter of law on the underlying claim, *i.e.*, Appellants' claim that they owned an undivided one-half interest in Hilea Nui.

Appellees were not required to do more than show that Appellants could not possibly prevail on the underlying claim in order to prevail on their motion for summary judgment. *See Sprague*, 102 Hawai'i at 202, 74 P.3d at 25 (stating that on summary judgment, "[t]he moving party may discharge his or her burden by demonstrating that if the

case went to trial there would be no competent evidence to support a judgment for his or her opponent[ ]" because "if no evidence could be mustered to sustain the nonmoving party's position, a trial would be useless[ ]" (quoting *Young v. Planning Comm'n of the County of Kaua'i*, 89 Hawai'i 400, 407, 974 P.2d 40, 47 (1999)) (citations and brackets omitted).

▇▇▇ Furthermore, this court has ruled that in an action to quiet title, only the relative interests of the parties to the action may be considered. *See Ka'u Agribusiness Co. v. Heirs or Assigns of Ahulau*, 105 Hawai'i 182, 187–88, 95 P.3d 613, 618–19 (2004) (stating that " '[i]t is enough that the interest asserted by the plaintiff . . . is superior to that of" the defendant such that a defendant "cannot argue that the bill may not be granted for the Plaintiffs simply because third parties . . . may have a right to title of the property" (quoting *United States v. Oregon*, 295 U.S. 1, 25, 55 S.Ct. 610, 79 L.Ed. 1267 (1935))). Thus, in *this* action to quiet title brought by Appellants, Appellees were only required to negate Appellants' contentions that Appellants had a right to title in the land. *See id.*

Appellants' citation to *Maui Land & Pineapple* for the proposition that the movant is required to show prima facie evidence of title to the land in dispute is misapplied. That case actually states, "In an action to quiet title, *the burden is on the plaintiff to prove title* in and to the land in dispute, *and, absent such proof, it is unnecessary for the defendant to make any showing. Maui Land & Pineapple*, 76 Hawai'i at 408, 879 P.2d at 513 (citing *Zimring*, 58 Haw. at 110, 566 P.2d at 729 (citations omitted) (emphasis added)). Thus, *Maui Land & Pineapple* actually contradicts Appellants' argument. As plaintiffs in the underlying quiet title action, Appellants were required to prove their right to title in Hilea Nui.

## XII.

Appellants' Reply Brief contends that Appellee C. Brewer "abandoned and waived" any arguments rebutting Appellants' contention that the court erred in denying their

motions for summary judgment. Appellants' argument in their reply brief is as follows

*Appellants argued in their Opening Brief that they were entitled to "partial summary judgment as a matter of law on conveyance of a 50/50 co-tenancy of the Mahele."* Their position is simple. Appellants argue that the proper starting point for an analysis of whether a co-tenancy relationship existed between [Lot] and Leleiohoku in the ahupua'a of Hilea is the Mahele. In summary, Appellants argue that the 1848 Mahele allotments to [Lot] and Leleiohoku occurred simultaneously, they conveyed freehold title, and the conveyance of a joint interest in land to two individuals constitutes a conveyance as tenants in common. Therefore, *because the Mahele simultaneously conveyed the "ahupua'a of Hilea" to both [Lot] and Leleiohoku, they held title to the "ahupua'a of Hilea" as co-tenants.* This co-tenancy has never changed.

(Emphases added.) (Internal citations omitted.)

Appellants next direct this court to HRAP Rule 28(c), which requires answering briefs to "be of like character as that required for an opening brief except that no statement of points shall be required, and no other section is required unless the section presented in the opening brief is controverted." Although not expressly articulated, Appellants apparently contend that Appellees were required to address the above-quoted argument in their respective reply briefs and, because they did not, Appellants must prevail on their argument that the court erred in denying Appellants' motions for summary judgment.

▇▇▇ Appellants' apparent position with regard to this point misconstrues HRAP 28(c) and contradicts the established burden of persuasion on appeal. HRAP Rule 28(c)'s provision that an answering brief need only contain sections corresponding to sections in the appellant's opening brief does not necessarily require the appellee to respond to each point raised in the opening brief. Reversal is not automatically mandated by the appellee's failure to respond to an alleged error argued by the appellant. *See Costa v. Sunn*, 5 Haw. App. 419, 430, 697 P.2d 43, 51 (1985) ("So

great is the burden on appellant to overcome the presumption of correctness that appellee's failure to file an answering brief does not entitle appellant to the relief sought from the appellate court, even though the court may accept appellant's statement of facts as correct."); *see also Lozano v. GTE Lenkurt, Inc.,* 122 N.M. 103, 920 P.2d 1057, 1064 (App. 1996) (interpreting New Mexico's Supreme Court Rules and holding that reversal is not required where the appellee either submits no answering brief or the answering brief does not address a particular issue (citations omitted)).

 On appeal, appellants are required to convince the appellate tribunal that a reversible error occurred in prior proceedings. *Hous. Fin. & Dev. Corp. v. Ferguson,* 91 Hawai'i 81, 92, 979 P.2d 1107, 1118 (1999) (reiterating that "[t]he burden is upon appellant in an appeal to show error" (quoting *Bettencourt v. Bettencourt,* 80 Hawai'i 225, 230, 909 P.2d 553 558 (1995) (citation omitted))); *Costa,* 5 Haw.App. at 430, 697 P.2d at 50 (stating that "the burden is on appellant to convince the appellate body that the presumptively correct action of the circuit court is incorrect" (citations omitted)). If appellees offer no contradictory arguments, an appellant does not automatically prevail on a given point of error asserted. *Id.* at 430, 697 P.2d at 51. Rather, when an appellee fails to respond, an appellant is required only to make a prima facie showing of error in order to obtain the relief sought. *Speedway Bd. of Zoning Appeals of Marion County v. Standard Concrete,* 150 Ind.App. 363, 276 N.E.2d 589, 591 (1971) (citations omitted). Thus, Appellants must, in their Opening and Reply Briefs, make a prima facie showing that the ruling was error.

Based on the reasoning set forth above, including, *inter alia,* our conclusion that the court properly granted Appellees' motion for summary judgment, Appellants have not made a prima facie showing that the court erred in denying their motion for summary judgment asserting an interest in Hilea Nui by virtue of the Mahele. Moreover, Appellees' arguments that the court correctly granted summary judgment in their favor implicitly argue against Appellants' conten-

tions that the court should have awarded summary judgment in their favor. Therefore, it cannot be reasonably said that Appellees did not sufficiently address Appellants' contentions that they are entitled to an undivided one-half interest in Hilea Nui.

### XIII.

As their third point on appeal, Omerod Appellants contend that the court erred in denying their Motion for Reconsideration.

#### A.

On April 1, 2004, Omerod Appellants filed a Motion for Reconsideration arguing, *inter alia,* that the court "used the wrong test for summary judgment, the [f]ederal test[.]" In addition, Omerod Appellants raised the same arguments regarding errors in the Decision and Order that are raised in this appeal.

At the hearing on the Motion for Reconsideration Omerod Appellants argued that this case

is a matter of public importance in that it emanates from the Mahele. The exact nature of the title created in this case is a matter of statewide concern because there is no prior case in recent times that has focused on the question of what kind of title emanates from the Mahele.

Counsel for MKA and Ka'u Agribusiness argued that "the only public importance issue . . . is enforcing the [B]oundary [C]ommission judgment and stipulated partition decree. . . ." Counsel continued, "It's important to uphold what those proceedings all determined back in the 1870's and what Judge [Shunichi] Kimura and you decided in the *Okuna* matter. That's the only public issue I see here. . . . Beyond that, this case is about private claimants' claim to title." Appellant TNC agreed with this argument and added that "as far as new evidence[,] there has been none presented today. This argument about public importance . . . could have been raised prior. All of the other arguments which [Appellants' counsel] made could have been made prior."

In denying the Motion for Reconsideration, the court explained:

[T]he [c]ourt was aware of the suggestion in [*Zimring* ] that summary judgment is not appropriate in matters involving issues of vast public importance.

Although this case is obviously very important to the litigants, it does not involve a question of vast public importance such as, for example, between the State and a private land owner, who owns new land created by lava at the oceanfront? Or as ... between the State and the private land owner, who owns the land adjacent to the ocean? Or as between the State and the private land owner, who owns the water flowing over the land?

■■■■■■ The court's denial of the Motion for Reconsideration is reviewed for an abuse of discretion. *Kienker v. Bauer,* 110 Hawai'i 97, 115, 129 P.3d 1125, 1143 (2006) (citing *Ass'n Of Apartment Owners of Wailea Elua v. Wailea Resort Co.,* 100 Hawai'i 97, 110, 58 P.3d 608, 621 (2002)). This court has repeatedly explained that "[t]he purpose of a motion for reconsideration is to allow the parties to present new evidence and/or arguments that could not have been presented during the earlier adjudicated motion." *Sousaris v. Miller,* 92 Hawai'i 505, 513, 993 P.2d 539, 547 (2000) (quoting *First Ins. Co. of Hawaii, Ltd. v. Lawrence,* 77 Hawai'i 2, 17, 881 P.2d 489, 504 (1994) (quoting *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 114, 839 P.2d 10, 27 (1992))) (internal quotation marks omitted). "Reconsideration is not a device to relitigate old matters or to raise arguments or evidence that could and should have been brought during the earlier proceeding." *Id.* (citations omitted).

## B.

As to this point, Omerod Appellants seem to raise two discernible arguments on appeal. First, that the court erroneously disregarded Omerod Appellants' contention that the court applied the federal standard for summary judgment, which was allegedly not applicable in Hawai'i. Second, that the court erroneously determined that this case "does not involve a question of vast public importance" such that summary judgment is inappropriate. Appellees responded that Appellants had not met the applicable standard for motions for reconsideration.[35]

## C.

The first issue, whether the court improperly applied the federal standard for summary judgment, has already been resolved against Appellants. *See supra* at 311, 172 P.3d at 1055–56.

As to the second issue, this court has held that some cases present such important questions that summary judgment is not an appropriate method of adjudication. For example, *State v. Zimring,* 52 Haw. 472, 479 P.2d 202 (1970), confronted the issue of land ownership after volcanic eruptions. In that case, the private owners and the State both claimed title to oceanfront land adjoining the Zimring's property created by a lava flow. *Id.* at 472–74, 479 P.2d at 203. The Zimrings moved for summary judgment based on kama'aina testimony[36] that "Hawaiian usage" established that such lands belonged to the party who owned the adjoining, preexisting property. *Id.* at 473–74, 479 P.2d at 203. This court, in reversing the trial court's

**35.** Appellee TNC responds that the court properly denied the Motion for Reconsideration because Omerod Appellants "failed to present any new evidence." *See Kaneohe Bay Cruises, Inc. v. Hirata,* 75 Haw. 250, 269, 861 P.2d 1, 11 (1993) (affirming denial of motion for reconsideration where movant's failure to produce evidence prior to summary judgment ruling indicated lack of due diligence, especially considering that movant could have requested a continuance to conduct additional discovery before the court ruled); *Gossinger v. Ass'n of Apartment Owners of the Regency Ala Wai,* 73 Haw. 412, 427, 835 P.2d 627, 635 (1992) (affirming denial of motion for reconsideration where movant "could and should have" presented the proffered evidence

before the court ruled on the motion for summary judgment). Appellees Olson Trust and C. Brewer also respond that the court did not abuse its discretion in denying the Motion for Reconsideration because "Appellants failed to present any new evidence.... Instead, Appellants rehashed the same facts and arguments." (Footnote omitted.)

Appellants do not reply to these arguments.

**36.** Kama'aina testimony is the testimony of "a person familiar from childhood with any locality[.]" *Application of Ashford,* 50 Haw. 314, 337, 440 P.2d 76, 89 (1968) (citation and quotation marks omitted).

grant of summary judgment in favor of the Zimrings, noted that "[t]his is a case of first impression on a question of vast public importance. The impact of this decision will not be limited to the case at hand but will count for the future[,]" and should not be resolved on summary judgment. *Id.* at 475, 479 P.2d at 204.

Other instances where this court has found the issue to be of such great public importance so as to preclude summary judgment include: (1) the availability of a tort action for mental or emotional injury without accompanying physical injury, *Leong v. Takasaki*, 55 Haw. 398, 401–02, 520 P.2d 758, 761 (1974) (noting that the right to maintain such an action "is a most unsettled question in the law of torts, an area 'clearly in a process of growth, the ultimate limits of which cannot as yet be determined[ ]' " (quoting Prosser, *Torts* 50, § 12 (4th ed.1971)); (2) whether a "flat grant" public assistance scheme was authorized under the governing statutes, (*Keller v. Thompson*, 56 Haw. 183, 194, 532 P.2d 664, 672 (1975) ("this is precisely the type of case where good judicial administration requires that the determination of the validity of the regulations be withheld until all testimony is adduced after a full trial[ ]").

On the other hand, even where litigation presented "complex issues" and the non-moving party asserted that the case presented "vast policy implications[,]" this court noted that summary judgment will still be appropriate if "there is no genuine issue as to any material fact and defendants clearly demonstrate they should prevail as a matter of law...." *Molokai Homesteaders Coop. Ass'n. v. Cobb*, 63 Haw. 453, 457–58, 629 P.2d 1134, 1138 (1981) (affirming grant of summary judgment in favor of defendants because "[a] review of the record indicates the relevant facts are undisputed for the most part and none of the disputed facts are material to the legal issues posed for resolution[ ]").

### D.

■ It cannot be concluded that summary judgment is not an appropriate avenue of disposition in this case. Omerod Appellants argue that they present issues of enor-

mous public import because the source of the disputed title stems from the Mahele. Inasmuch as all title to land in Hawai'i traces its origins to the Mahele, this cannot reasonably be termed a case of first impression. *Bennett*, 57 Haw. at 201, 552 P.2d at 1385–85 ("Kamehameha III ... was in the fullness of the common law phrase 'the universal lord and original proprietor of all lands in his kingdom.' He was the source of title." (Quoting *Carter v. Territory*, 14 Haw. 465, 470 (1902), *rev'd on other grounds*, 200 U.S. 255, 26 S.Ct. 248, 50 L.Ed. 470 (1906))). Furthermore, given that our case law treats the Mahele and its ramifications extensively, Omerod Appellants' argument that the outcome of this case will have a profound effect on our jurisprudence is not persuasive. *Molokai Homesteaders* clearly demonstrates that summary judgment is appropriate in this case because Appellees have demonstrated that the relevant facts regarding the Boundary Commission judgments are undisputed and the disputed facts are not material to the issue of collateral estoppel. 63 Haw. at 457–58, 629 P.2d at 1138.

For the foregoing reasons, the Rule 54(b) judgment as it relates to the Motion for Reconsideration is affirmed.

### XIV.

### A.

On November 30, 2004, Omerod Appellants filed a Motion to Alter or Amend the Rule 54(b) Judgment. In their supporting memorandum, Omerod Appellants argued that the book of maps including the 1902 Cridge map discovered earlier that summer by the archaeologist showed Hilea as a single ahupua'a, thus directly contradicting Appellees' arguments that the Boundary Commission defined the respective boundaries of LCA 7715 and LCA 9771 as two separate ahupua'as. Omerod Appellants contended that the map created a genuine issue of material fact that should have precluded summary judgment, because the cartographer included in his map the Boundary Commission's dividing line between Hilea Iki and Hilea Nui, but "he did not put it in as an ahupua'a boundary." Additionally, Omerod Appellants ar-

gued that the book of maps should have been produced in response to their interrogatory. The relevant interrogatory states:

> Please state specifically what your title is to the portion or portions of the land described in the Complaint, listing for each portion you claim the tax key, grant number, allotment number, metes and bounds description, and area.
>
> PLEASE PRODUCE ... ANY SURVEY MAPS OR OTHER DOCUMENTS IN YOUR POSSESSION WHICH PERTAIN TO THE ABOVE.

### B.

Appellee C. Brewer argued that the 1902 map could not change the Boundary Commission boundaries, and the maps in the book were not intended "to deal with legal boundaries or title." Appellee C. Brewer further argued that "[Cridge] was not around at the time of the Boundary Commission Judgment and what he did many years later is totally irrelevant to what we're doing here today and totally irrelevant to our earlier motion for summary judgment. . . ." Finally, Appellee C. Brewer argued that the Cridge map was not responsive to Omerod Appellants' interrogatory because it was not a survey map, but rather, a "sugarcane field map." Appellees Olson and TNC made essentially the same arguments. Appellee Olson argued that the subpoenaed books were "workbooks" and "what is drawn by a surveyor doesn't affect legal rights." Appellee TNC argued, "It's a workbook, it's a field book. It is not a survey. . . . Mr. Cridge was not competent to change the decision of the monarchy's Boundary Commission ... [or] the Land Commission. . . ."

### C.

The court heard the motion on January 13, 2005. At the hearing, Appellee C. Brewer objected to the production of the map book as irrelevant, but the court accepted it into evidence. Appellees also argued that the map "was not a survey," but rather, a "field or plantation map." They stated that it was not the map's "intention to deal with legal boundaries."

The court ultimately denied the motion to alter or amend the Rule 54(b) judgment. The court ruled, in pertinent part, that

> the maps at issue were sugarcane or field maps[, n]ot generated for the purpose of defining title or boundary issues. The maps at issue apparently were created after the Boundary Commission determinations. And the maps do not rise to the level of judgments which would supersede the Boundary Commission Judgments. . . . *Therefore the maps do not create genuine issues of material fact that would cause the [c]ourt to alter the [c]ourt's prior decision regarding the dispositive nature of the Boundary Commission Judgments as a matter of law. . . .*

(Emphasis added.)

### D.

Omerod Appellants contend that the court's denial of their Motion to Alter or Amend Judgment was erroneous for four reasons. First, that the court erred because "the 1902 Cridge map was clearly based on official surveys of a District Judge and the 1877 Boundary Commission judgments, and showed the latter did not divide two ahupua'as but rather created two 'ilis or administrative divisions within one Hilea ahupua'a." Second, the court erred because "Appellants did not offer the Cridge map to the trial court as 'superceding judgment,' but rather as admissible, extrinsic evidence of the nature of the 1877 Boundary Commission judgments, for purposes of determining issue preclusion." Third, that the "Cridge map either showed a lack of identity between the claims adjudicated in the 1877 Boundary Commission proceedings and the present case, or raised genuine issues of fact as to this crucial component of issue preclusion, either of which required denial of summary judgment." Fourth, that the court "abused its discretion when it refused to impose sanctions for C. Brewer's flagrant concealment of this crucial and highly relevant Cridge map during discovery."

### E.

Appellee TNC responds that the court correctly denied the motion to alter or amend

judgment because "nothing in the Cridge Maps can successfully challenge the Boundary Commission's ... determination of the boundary between Hilea Iki and Hilea Nui." Appellee TNC further states that, "even if the Cridge maps were of probative value, they do not meet the ... definition of 'material' for withstanding summary judgment." (Citing *Durette v. Aloha Plastic Recycling, Inc.*, 105 Hawai'i 490, 501, 100 P.3d 60, 71 (2004) ("A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." (Citations omitted.)). Appellee TNC contends that the maps "do not refute any of the essential elements of TNC's defense because the maps cannot assail the Land Commission awards or the Boundary Commission judgments."

Appellees Olson and C. Brewer answer that "[t]he maps did not, and were not intended to, delineate the legal boundaries of Hilea Nui and Hilea Iki." They point out that "[e]ven survey maps are not proof of title." (Citing *Santos v. Perreira*, 2 Haw.App. 387, 393, 633 P.2d 1118, 1123 (1981) ("The persons who prepared these survey maps [depicting disputed dirt road] are persons expert in the field of survey. They are not expert in the fields of easement, highway and conveyancing law, which they must be in order to render an expert opinion on the questions whether the road is legally a public road....")). Appellees Olson and C. Brewer state that the maps "could not change the legal results of the Land Commission and Boundary Commission proceedings decades after the fact."

Additionally, Appellees Olson and C. Brewer posit that the court did not abuse its discretion in denying Appellants' motion for sanctions because: (1) "C. Brewer's response to the ... request for documents was not incomplete or incorrect[, n]or did it omit information that could have led to the discovery of admissible evidence"; (2) "Appellants requested survey maps, not field maps, or any other maps of the property" such that "C. Brewer was not required to supplement its response under Rule 26(e)(2)"; and (3)

"the maps were not 'material' or relevant to" the court's collateral estoppel analysis.

### F.

In reply, Omerod Appellants argue that C. Brewer committed fraud on the court. The alleged fraud appears in the Declaration of C. Brewer's Vice President of Real Estate, in which he states that Cridge's maps were based on "underlying maps from some unknown source...." Omerod Appellants assert that C. Brewer's counsel reiterated this allegedly fraudulent statement at the January 13, 2005 hearing, when he stated that the maps used "some underlying map that nobody knows at this point how—what critics were relying on...." They then point out the court relied on this alleged fraud when it ruled that "there is no evidence as to what the cartographer relied upon in drawing the maps. Therefore the maps do not create genuine issues of material fact that would cause the [c]ourt to alter the [c]ourt's prior decision...." Furthermore, Omerod Appellants argue that Appellee C. Brewer failed to offer any counter-argument to the fraud allegation, and thus "waived any argument regarding the fraud contained in the December 30, 2004, declaration."

### G.

A motion made pursuant to HRCP [Rule] 59(e) to alter or amend a judgment is reviewed under the abuse of discretion standard. *Gossinger*, 73 Haw. at 425, 835 P.2d at 634. An abuse of discretion occurs when the trial court "exceeds the bounds of reason of law or practice to the substantial detriment of a party." *Kawamata Farms v. United Agri Prods.*, 86 Hawai'i 214, 241, 948 P.2d 1055, 1082 (1997).

The court did not abuse its discretion in concluding that the 1902 Cridge maps could not refute the 1877 Boundary Commission judgments such that the court should alter its decision that the Boundary Commission judgment precluded this lawsuit. This court has stated that "maps and surveys are of no greater value as evidence than the information on which they were based." *State by Kobayashi v. Midkiff*, 49 Haw. 456,

473, 421 P.2d 550, 560 (1966) (citing *Boundaries of Kapahulu*, 5 Haw. 94 (1883)). According to the "Explanation" on the Cridge maps, they were based on "[a] plantation map and new surveys by J.H. Waipuilani[.]" Omerod Appellants declare that J.H. Waipuilani was a Representative to the Legislature in the late 1800s and a sitting District Court Judge of Ka'u at the turn of the twentieth century.

However reliable Judge Waipuilani may have been, his map and survey have not been shown to be "the expression of original kamaaina testimony or contemporary knowledge at or about the time of the Mahele" or that they could affect the Boundary Commission judgment. *See Midkiff*, 49 Haw. at 473, 421 P.2d at 560 (citing *Boundaries of Pulehunui*, 4 Haw. at 251; *Boundaries of Kahua 2*, 20 Haw. 278, 285 (1910)). Accordingly, the map could not create a genuine issue of material fact regarding the dispositive nature of the Boundary Commission judgment. Thus, the court did not abuse its discretion in refusing to alter or amend the Rule 54(b) Judgment.

### XV.

Appellants' various notices of appeal claim to appeal from the court's July 7, 2005 Order Denying Defendant C. Brewer & Company, Ltd.'s Motion to Quash Subpoena Issued to John Cross, C. Brewer & Company, Ltd., but their briefs do not address this order in either the statements of issues on appeal or argument sections. Arguments not presented in accordance with HRAP Rule 28(b) may be disregarded and thus will be disregarded on this issue. HRAP Rule 28(b)(4) ("Points not presented in accordance with [HRAP Rule 28] will be disregarded, except that the appellate court, at its option, may notice a plain error not presented."); *Sprague*, 102 Hawai'i at 195, 74 P.3d at 18 ("It is within the appellate court's discretion whether to recognize points not presented in accordance with HRAP Rule 28(b)(4).").

### XVI.

#### A.

On July 8, 2005, the court denied Omerod Appellants' Motion for Relief from Judgment and for Sanctions under HRCP Rule 60(b) (Rule 60(b) Motion). In that motion, Omerod Appellants moved for

> relief from the [November 30, 2004 Rule 54(b) Judgment], and for sanctions against ... C. Brewer ... based upon newly discovered evidence and fraud, misrepresentation and other misconduct by ... C. Brewer.... [Omerod Appellants] and this [c]ourt have relied upon ... C. Brewer's apparent fraud, misrepresentations, and other misconduct which ultimately resulted in severe prejudice to [Omerod]....

Omerod Appellants' memorandum in support of the Rule 60(b) Motion set forth the bases of their request as follows:

> C. Brewer has always been aware that R.C. Cridge drew a series of maps in 1902 for plantation purposes.... All three Cridge maps have the identical detail regarding the boundaries of Hilea as only one ahupua'a. C. Brewer has been aware that the recently discovered large August 1902 Cridge map was based on "new surveys" because that is what it states on the face of the map! *C. Brewer concealed the existence of these two large maps ... although it had these maps in its possession and on its index of maps for over 100 years. This concealment was fraudulent. The Declaration of John Cross, a C. Brewer executive, utilized to oppose the prior motion to set aside the judgment, provided in part: "... for some reason Cridge did not highlight the common boundary in yellow ... and used underlying maps from some unknown sources to depict approximate ahupua'a boundaries ...[.]"* ... *C. Brewer intentionally concealed the source of the Cridge ahupua'a boundary information from the [c]ourt and [Omerod Appellants] to prevent the existence of a "genuine issue of material fact" that would make summary judgment impossible ... and would have provided the grounds for this [c]ourt to have granted [Omerod Appellants'] Motion to Alter or Amend.*

(Emphasis added.) As discussed *supra* at 253, 172 P.3d at 997, Omerod Appellants also

argued that there was another map in C. Brewer's possession contradicting the court's finding that LCA 7715:14 to Lot was synonymous with Hilea Iki.

In its Memorandum in Opposition, TNC argued that relief under HRCP Rule 60(b) should be denied because

> [t]he "newly discovered" maps cannot negate the Boundary Commission's decision regarding the existence of the two separate lands of Hilea Iki and Hilea Nui. Also, the new maps cannot serve as a basis for awarding a new trial ... because the new maps offer merely cumulative evidence that will not change the outcome of the [Rule 54(b) Judgment]. Finally, even if the new maps were of probative value, they do not meet the Hawai'i Supreme Court's definition of "material" for purposes of withstanding summary judgment and therefore the new maps do not justify this [c]ourt's setting aside the [Rule 54(b) Judgment].

(Emphases added.)

In its memorandum in opposition, C. Brewer argued that Omerod Appellants sought to "dodge" the denial of the Motion to Alter or Amend "with purposeful partial cites to the record and increasingly virulent accusations, such as false sworn declarations by C. Brewer Vice President John C. Cross being fraud on the [Appellants] and the [c]ourt." C. Brewer urged the court to not only deny the Rule 60(b) motion, but to strike it "as scandalous under [HRCP Rules] 12 and 7" and award C. Brewer its costs in responding to the motion. C. Brewer contended that the Rule 60(b) motion should be denied because: (1) "the three maps are not survey maps and therefore were not responsive to [Omerod's] discovery request"; (2) "even surveyor's maps have no legal significance in disputes over titles or boundaries"; and (3) "the 'new evidence' ... cannot alter or amend the clear unambiguous Boundary Commission Judgments issued in the 1870s."

As to the issue of discovery abuse, C. Brewer asserted that "[t]he [c]ourt has not ordered C. Brewer to do anything that C. Brewer hasn't done. [Omerod Appellants] cite the Kawamata opinion on [HRCP Rule] 37(b)(2) sanctions, when there was no order

entered herein requiring the discovery now moved on. [Omerod Appellants] want to skip right to sanctions." Finally, C. Brewer reiterated its contention that "accusations of false statements by John C. Cross are 'scandalous' as defined by [HRCP] Rule 12 ... and made applicable to Motions by [HRCP] Rule 7(b)(3)."

In its oral ruling, the court first addressed the allegations of fraud and misrepresentation, stating that it

> would have anticipated even with that ... first interrogatory and request for production that the Cridge maps would have shown up, but I can see where Mr. Cross might have taken the position that that wasn't something that was needed to be produced because it wasn't a survey map. I'm not gonna say that Mr. Cross committed fraud, but I would have hoped that ... these things would have been produced earlier.

(Emphasis added.)

As to the issue of whether the Rule 54(b) Judgment should be set aside, the court reiterated that the maps "would not make a difference in regard to the [c]ourt's prior analysis. The maps do not rise to the level of judgments which would supersede the Boundary Commission judgments."

**B.**

A trial court's disposition of a motion brought under HRCP Rule 60(b) is reviewed for abuse of discretion. Greene v. Greene, 8 Haw.App. 559, 569, 815 P.2d 28, 32 (1991) (citing Paxton v. State, 2 Haw.App. 46, 625 P.2d 1052 (1981); Hayashi v. Hayashi, 4 Haw.App. 286, 290–91, 666 P.2d 171, 175 (1983)). On appeal, Omerod Appellants argue that the court abused its discretion in that it "should have imposed sanctions and/or vacated its prior order of judgment" because "C. Brewer violated the discovery rules and intentionally withheld relevant evidence[.]" They argue that under this court's precedent in Kawamata Farms and Matsuura v. E.I. du Pont, 102 Hawai'i 149, 73 P.3d 687 (2003), "where nondisclosure due to fraud, misrepresentation or misconduct occurs, sanctions

should be imposed equal to the benefit obtained by the errant party."

Omerod Appellants characterize C. Brewer's trial strategy as an attempt to convince the court that Appellants' single ahupuaʻa theory was a "recent construct." Then, they argue that: (1) when C. Brewer argued this "recent construct" theory "that its own 100–year–old maps" supported the Appellants' single ahupuaʻa theory; (2) C. Brewer "clearly intended both [the court] and Appellants to rely on its 'recent construct' concealment strategy until this lawsuit was dismissed"; and (3) the court and Appellants "relied on this strategy and Appellants' claims were dismissed." Omerod Appellants claim that this was "clearly fraud" under *Shoppe v. Gucci Am., Inc.*, 94 Hawaiʻi 368, 386, 14 P.3d 1049, 1067 (2000) (setting forth the elements of fraud as: "(1) false representations ... made by defendants, (2) with knowledge of their falsity (or without knowledge of their truth or falsity), (3) in contemplation of plaintiff's reliance upon these false representations, and (4) plaintiff did rely upon them"). Omerod Appellants also contend that even if C. Brewer's conduct did not rise to the level of fraud, "it was at least intentional misrepresentation or misconduct that justified the strongest sanctions...."

Omerod Appellants additionally filed a Citation to Supplemental Authority on May 24, 2006, citing to our decision in *Arakaki v. SCD–Olanani Corp.*, 110 Hawaiʻi 1, 129 P.3d 504 (2006), for the proposition that grants of summary judgment should be reversed when the prevailing party "fraudulently concealed from the trial judge before summary judgment crucial facts...." [37]

In answer, Appellee TNC argues that the court correctly denied the Rule 60(b) Motion "because the Cridge Maps were not credible evidence and could not affect the outcome of the case.... [N]othing in the Cridge maps can successfully challenge the Boundary Commission's [n]ineteenth [c]entury determination of the boundary between Hilea Iki and Hilea Nui." Appellee TNC repeats its contention that the maps "are neither 'credible' nor 'of such a material and controlling nature as will probably change the outcome' " of the Rule 54(b) Judgment. (Citing *Kawamata Farms*, 86 Hawaiʻi at 251, 948 P.2d at 1092.) (Emphasis omitted.) It asserts that the Cridge maps are not "material" as defined by this court inasmuch as they "do not refute any of the essential elements of TNC's defense because the maps cannot assail the [LCAs] or the Boundary Commission judgments."

In response, Appellees Olson and C. Brewer contend that the court did not abuse its discretion in denying the Rule 60(b) Motion since the Cridge maps "were not relevant or 'material' to" the issue of collateral estoppel decided by the court because they "did not, and were not intended to, delineate the legal boundaries of Hilea Nui and Hilea Iki." Ap-

---

37. Appellee Olson responded to Omerod Appellants' May 24, 2006 letter stating that the arguments contained therein should be stricken because they did not comply with HRAP Rule 28(j) (2006). That rule provides in pertinent part that parties may

> bring to the appellate court's attention pertinent and significant authorities published after a party's brief has been filed, but before a decision.... The letter shall provide references to either the page(s) of the brief or to a point argued orally to which the citations pertain. The letter shall, without argument, state the reasons for the supplemental citations.

Appellee Olson contends that Omerod Appellants "improperly re-argue[ ] points raised in [their] briefs and make[ ] false and inflammatory accusations of 'fraudulent concealment' against Defendant–Appellee C. Brewer...." Appellee Olson further relates that the Citation to Supplemental Authority is inappropriate inasmuch as the opinion in *Arakaki* was first published on February 23, 2006, and was corrected on March 1, 2006, *before* Omerod Appellants filed their Reply Briefs on March 24, 2006.

Without resolving the issues regarding Omerod Appellants' compliance with HRAP Rule 28(j), we note that our decision in *Arakaki* does not support their position. First, we did not hold that fraudulent concealment of evidence by one party could be imputed to his or her successor-in-interest. Second, the grant of summary judgment in favor of Arakaki was vacated because his motion was not supported by evidence sufficient to "rule out genuine issues of material fact[,]" *Arakaki*, 110 Hawaiʻi at 8, 129 P.3d at 511, as to the underlying claim. In contrast, as discussed *supra*, in this case, Defendant MKA's motion for summary judgment was supported by "undisputed facts" sufficient to "obviate trial of the factual issues raised" in the Amended Complaint, namely, Appellants' claim to an interest in Hilea Nui by virtue of their interest in LCA 7715:14. *See id.*

pellees Olson and C. Brewer point out that "[e]ven survey maps are not proof of title." (Citing *Perreira*, 2 Haw.App. at 393, 633 P.2d at 1123.) They maintain that Cridge and J.H. Waipuilani "could not change the legal results of the Land Commission and Boundary Commission proceedings decades after the fact." Lastly, Appellees Olson and C. Brewer contend that the court did not err in denying Omerod Appellants' relief based on the alleged fraud and misrepresentation because: (1) the maps "were not material/relevant to proving or disproving official acts of the Kingdom of Hawai'i" and (2) C. Brewer's conduct "did not rise to the level of fraud, misrepresentation and misconduct justifying such relief."

### C.

The court's decision not to impose discovery sanctions is reviewed for abuse of discretion. *Stender v. Vincent*, 92 Hawai'i 355, 362, 992 P.2d 50, 57 (2000). It cannot be concluded that the court abused its discretion. In its oral ruling, the court implicitly found that C. Brewer's interpretation of the discovery request was reasonable when it stated, "I can see where Mr. Cross might have taken the position that [the Cridge map] wasn't something that was needed to be produced because it wasn't a survey map." Based on this finding, the court did not abuse its discretion in determining that sanctions were not warranted in this case.

### D.

When a motion for relief is brought under HRCP Rule 60(b)(2), a new trial

> can be granted provided the evidence meets the following requirements: (1) it must be previously undiscovered even though due diligence was exercised; (2) it must be admissible and credible; and (3) *it must be of such material and controlling nature as will probably change the outcome* and not merely cumulative or ending only to impeach or contradict a witness.

*Kawamata Farms*, 86 Hawai'i at 251, 948 P.2d at 1092 (emphasis added). Applying this standard, it cannot be concluded that the court abused its discretion in refusing to overturn the Rule 54(b) Judgment. As pointed out by the Appellees, the maps could not successfully attack the Boundary Commission judgments inasmuch as those maps were made a quarter of a century after the Boundary Commission settled the boundaries of Hilea Iki and Hilea Nui. It is irrelevant to the dispositive nature of the Boundary Commission judgments that decades later, C. Brewer and its agents might have thought that C. Brewer had a larger interest than it did.

### XVII.

For the reasons set forth, we affirm the court's: (1) November 30, 2004 Rule 54(b) Judgment, (2) February 4, 2005 Order denying Appellants' Motion to Alter or Amend and for Sanctions; (3) July 7, 2005 Order denying Appellees' Motion to Quash; and (4) July 8 Order denying Appellants' Motion for Relief under HRCP Rule 60(b) and for Sanctions.

LEVINSON, J., concurs in the result only.

